52 A.3d 1139

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Dwayne BROWN, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 14, 2010.

Decided Aug. 21, 2012.

108

110

Paul M. George, McKinney & George, Philadelphia, for Dwayne Brown.

Peter Rosalsky, Defender Association of Philadelphia, Philadelphia, for Appellant Amicus Curiae, Defender Association of Philadelphia.

Hugh J. Burns Jr., Philadelphia District Attorney's Office, Philadelphia, Suzan Willcox, Plymouth Meeting, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

112

■■■■■■■■■■

## *OPINION*

Justice TODD*.

In this appeal, our Court is presented with two questions: (1) whether a defendant's convictions for first-degree murder and other crimes which rest solely on subsequently recanted out-of-court statements given to police violate the due process guarantees of either the United States or Pennsylvania Constitutions; and (2) whether the confessions of a former co-defendant should have been admitted as evidence as statements against interest under Pa.R.E. 804(b)(3). After careful consideration, we hold the recanting witnesses' out-of-court statements to the police were sufficient to sustain Appellant's convictions against a due process challenge. However, because we also find that the trial court erred by not allowing other portions of the co-defendant's confessions to be entered into evidence as statements against interest, we are constrained to vacate Appellant's convictions and remand for a new trial.

## I. *Background*

The following pertinent factual and procedural history is necessary to understand the issues presented by this appeal. In the evening hours of December 4, 2000, at or around 8:43 p.m., a group of men were assembled outside the Cleveland Minimarket ("Minimarket"), located at the intersection of Cleveland and York Streets in the North Philadelphia neighborhood. Abutting the southern border of the Minimarket was a vacant lot. Immediately behind the Minimarket, adjoining its western side, was a six-foot-wide alleyway which exited onto York Street. The men congregated outside of the Minimarket were involved in a dice game, played on the sidewalk which lay between the eastern side of the Minimarket and Cleveland Street ("Cleveland Street sidewalk").

---

* Justice Todd announces the Judgment of the Court. Justice Todd delivers the Opinion of the Court with respect to Parts I, II and IV, in which Justices Saylor, Baer, and McCaffery join, and a plurality Opinion with respect to Part III, in which Justices Baer and McCaffery join.

As the dice game concluded, three of the players, Anthony "Manny" Williams, Keita "Ta Ta" Lacey, and Donald McCoy a/k/a "Don King," walked up the Cleveland Street sidewalk and turned left onto the sidewalk which lay between the northern side of the minimarket and York Street ("York Street sidewalk"). The three men stopped near the corner of the two sidewalks where a payphone was located, as McCoy decided to make a phone call. While McCoy was talking on the phone, with Williams and Lacey standing nearby, armed gunmen, who had covered the lower portions of their faces, rushed towards the trio and opened fire. All three men were struck during the ensuing hail of bullets. There was no evidence that any of the shooting victims fired back at their assailants during this episode.

After the shooters fled, bystanders used their cars to transport the victims to nearby Temple Hospital. Two of the injured men, Lacey and Williams, were pronounced dead on arrival at the hospital. The Philadelphia Medical Examiner later determined, after examining a bullet taken from Lacey's body, that Lacey died of a gunshot wound to his left hip inflicted by a .44 caliber bullet. The Medical Examiner concluded that Williams died from heavy internal bleeding caused by a .38/.357[1] caliber bullet.[2] McCoy was shot in the right side of his abdomen; additionally, a spent .44 caliber round was recovered from the inside of his jacket. McCoy underwent emergency surgery, and he subsequently made a full recovery.

Officer Kevin Conaway, who responded to the report of the shooting, found six spent shell casings at the scene. Ballistics testing revealed that all six empty cartridges were ejected by the firing of a single "9 mm" firearm, which Officer Lay opined was either a "Glock" or "Smith and Wesson" model. A 9 mm. semiautomatic pistol was also found by Officer Cona-

---

1. The Police Department's ballistics expert who testified at trial, Officer Kenneth Lay, explained that the bullet was designated officially as .38/.357 caliber bullet, since a .38 caliber bullet and a .357 caliber bullet are both the same diameter. N.T. Trial, 2/6/06, at 120.

2. Williams also sustained a gunshot wound to his left elbow. The bullet which caused that wound was not recovered.

way, lodged underneath Williams' body as it lay on the sidewalk. Testing of this weapon indicated it was not the source of the spent 9 millimeter shell casings. Additionally, a bullet fragment of undetermined origin was discovered intermixed with the spent shell casings. Further, a bullet strike mark was observed by one of the investigating officers on the wall behind the payphone where McCoy was standing. Based on his examination of the totality of the recovered physical evidence, Officer Lay opined at trial that three separate guns had been discharged during the shooting episode. Officer Lay testified that the .44 caliber round recovered from McCoy's jacket and Lacey's body was most likely fired by the same .44 caliber revolver; the .38/.357 magnum round recovered from Williams' body was probably fired by a .38/.357 caliber revolver; and the spent 9mm cartridges were ejected during the firing of a semiautomatic weapon.[3] The actual guns used in the shootings were never recovered by the police.

Although a crowd gathered near the scene in the shooting's immediate aftermath, no one came forward to offer police any information. Consequently, the investigation was at a standstill for over a month and a half, until, on January 23, 2001, an individual called the police station and requested to speak with the homicide detective who was overseeing the investigation into the shootings—Detective Gerald Lynch. After the individual on the phone told Detective Lynch that he was an eyewitness to the shooting, and, also, that he knew one of the victims, Williams, Detective Lynch asked him to come to the homicide division and talk with him about the investigation. The individual complied—presenting himself to Detective Lynch as "John Garvin," N.T. Trial, 2/2/06, at 157; however, the individual was not, in fact, John Garvin, but, rather, his younger brother David Garvin.

Detective Lynch testified at trial that he took Garvin upstairs to an interview room and asked him a series of ques-

3. Officer Lay noted that, while it was theoretically possible to load a .38/.357 caliber round into a nine millimeter cartridge case, based on his examination he concluded the .38/.357 round he examined was "revolver designed," and that it was "very unlikely" someone would use it in that fashion. N.T. Trial, 2/6/06, at 122–124.

tions, which the detective memorialized in his own handwriting, along with Garvin's answers. Detective Lynch had Garvin sign the bottom of each page of the statement, in addition to an "adoption attestation form" at the end of the statement, which is an affirmance by the signatory that he has read the statement and agrees it is true and correct. In each place Garvin signed, he used the name "John Garvin." N.T. Trial, 2/1/06, at 275–279.

In the statement, Garvin related that the following series of events occurred on the night of the shooting: Around 8:43 p.m., he was walking up York Street in the direction of the Minimarket, and he stopped outside a convenience store located across from the Minimarket. While standing there, Garvin looked down Cleveland Street and saw Appellant and Jasaan Walker, both of whom he had known for two years, walking up Cleveland Street towards York Street. He noticed them enter the vacant lot on the southern side of the Minimarket and then, very shortly thereafter, saw two people come out from the alley behind the Minimarket and onto York Street. Although both of these individuals wore masks around their mouth and nose, Garvin was confident that they were Appellant and Walker because of the short duration between his observation of them going into the lot and the appearance of the two masked men on York Street. According to Garvin, once Appellant and Walker emerged from the alley onto York Street, both began shooting at Williams, Lacey, and McCoy. Garvin heard approximately five or six shots; Appellant carried a nine millimeter handgun, and Walker had a "Glock 40;" and the entire episode lasted 10 or 15 seconds.

Detective Lynch testified that, after Garvin provided him with this information, he showed Garvin two computer generated photo arrays. Garvin selected Appellant's picture from the first array, chose Walker's photo from the second array, and identified both as the individuals he saw shoot the victims. Garvin printed the name "John Garvin" and the date on a copy of both photo arrays underneath each of the photos he had chosen. N.T. Trial, 2/1/06, at 276–279.

One week after Detective Lynch's interview of Garvin, on January 30, 2001, Lynch and another detective transported Lionel Lawrence from his home to the police station for questioning, as one of the bystanders at the shooting had supplied Lawrence's name to the police. Detective Lynch, who recorded the interview by hand, recalled that Lawrence, who had moved from the neighborhood shortly before the interview, was upset the detective wanted to talk to him about the murders and said he was "concerned for his well-being." N.T., Trial, 2/6/06, at 124, 127. According to Lawrence's statement, on the night of the shootings, he was traveling along York Street and turned left onto Cleveland Street when he observed Lacey, whom he knew, standing near the payphone at the corner of York and Cleveland Streets with Williams, McCoy and others, and he decided to stop to talk. When traffic began to back up due to his stopped vehicle, he decided to circle the block. When he prepared to turn again onto Cleveland Street from York Street, he saw two men, wearing dark jackets and with their mouths covered by masks, approach the Minimarket on the York Street sidewalk and shoot Lacey, Williams, and McCoy. He accelerated down Cleveland Street out of fear, but then, after the shooting ceased, he backed up Cleveland Street to the corner. McCoy got into Lawrence's car, and Lawrence drove him to Temple Hospital and helped him into the emergency room.

Detective Lynch next showed Lawrence two photo arrays, and Lawrence selected Appellant's photo from the first array as one of the individuals he saw shooting the victims, and selected Walker from the second array as the other shooter. Id. at 136–137. Detective Lynch noted that Lawrence printed his name under the two pictures he selected and noted the date beside them.

Arrest warrants were issued for both Appellant and Walker. Appellant was taken into custody in February 2001. He did not make a confession, nor did he provide any inculpatory statements related to the shootings. His preliminary hearing was held on March 8, 2001. At that hearing, David Garvin testified, under his real name, and recounted substantially the

same details included in the statement he had previously given to Detective Lynch. Garvin further testified that he was standing "two or three" feet away from Appellant and the victims when the shootings occurred. N.T. Trial, 2/1/06, at 294–295 (quoting N.T. Preliminary Hearing, 3/8/01).

At the preliminary hearing, Garvin was cross-examined by Appellant's counsel, who pressed him regarding his ability to identify Appellant, asking him whether the person he claimed was Appellant had a moustache or beard. Although Garvin could not say whether Appellant had any facial hair, he insisted that his identification was correct, emphasizing that, "I know [Appellant] when I see him." N.T. Trial, 2/2/06, at 22 (quoting N.T. Preliminary Hearing, 3/8/01). At the conclusion of the hearing, Appellant was held for trial on two counts of first-degree murder and related offenses.

Walker remained at large until May 5, 2001. Once taken into custody and given his *Miranda* rights, Walker gave both a written and a videotaped statement[4] to police detectives (hereinafter the "confessions" or "Walker's confessions") in which he admitted to planning and carrying out the shooting of Williams with his two half-brothers—"Fuss" and "Cub." He explained their joint involvement in a lengthy conspiracy to distribute cocaine, offered a motive for the shooting, described the weapons he and his half-brothers used in the shooting, and, also, in response to police questioning, denied Appellant's involvement in the shooting. Based on these confessions, Walker was held for trial on two counts of first-degree murder and other charges.

According to the trial testimony of Police Detective Joseph Centeno, in 2004, as Appellant and Walker were in jail await-

4. These confessions are discussed more fully *infra* at part II.B. The trial court granted Appellant's request to make these confessions, and Walker's later oral and written guilty plea colloquies, part of the certified record for appellate review. While the transcript of Walker's oral plea colloquy, as well as the written and videotaped records of Walker's confessions have been transmitted to our Court, the written plea colloquy is contained only within the Reproduced Record; however, the accuracy of the reproduction has not been disputed and, thus, we may consider it. *Commonwealth v. Killen*, 545 Pa. 127, 130 n. 5, 680 A.2d 851, 852 n. 5 (1996).

ing trial, Allen Lanier, who was then incarcerated in Pittsburgh, contacted Detective Centeno to provide information regarding an unrelated homicide. Detective Centeno had Lanier transported to Philadelphia in March 2004 to interview him, and while speaking with Detective Centeno about that murder, Lanier told him that he also had information regarding the instant case. Lanier claimed that he was present the evening of the shooting, and he gave the following version of the events: Lanier was playing dice with Lacey, Williams, and McCoy, whom Lanier considered to be his best friend, on the Cleveland Street sidewalk and had lost all of his money. Once the dice game broke up, and the three went to the corner where the Cleveland and York Street sidewalks met, Lanier followed. While Williams was talking on the phone, Lanier crossed York Street and stood at the northwest corner of York and Cleveland Streets to wait for him to finish. At that moment, Lanier noticed Appellant and Walker, both of whom he had known for 11 years, peeking out from a nearby lot. Appellant and Walker then exited the lot wearing masks and carrying guns. Lanier watched them as they rushed towards the corner and opened fire.

On May 18, 2004, Lanier was interviewed again by two members of the Philadelphia District Attorney's Office—Assistant District Attorney Mark Gilson, who prosecuted Appellant at trial, and Assistant District Attorney Edward McCann. During this interview, according to the trial testimony of ADA McCann, Lanier's statement to Detective Senteno and Fuss' role in the shooting were discussed. Lanier also mentioned that he was receiving threats in prison, and, as a result, ADA McCann arranged to have Lanier moved to a different facility.

Detective Rodden testified that, on May 24, 2004, he took yet another statement from Lanier, in which Lanier told him that Walker learned of his statement to Detective Centeno implicating Walker in the shootings. Lanier claimed that in April 2004 Walker approached him in a Philadelphia correctional facility where they were both being held, and told him to "bend but don't break," which Lanier interpreted as an instruction to tell detectives a little bit of the truth about how

the incident transpired, but not to tell them everything. N.T. Trial, 2/6/06, at 20. Lanier also related to Detective Rodden that Walker's mother, during a visit to that same prison facility, asked him not to testify against her son, or, if he did testify, to "flip." *Id.* at 19. Lanier described "flipping" to Detective Rodden as the practice of telling police one thing and then, when on the witness stand at trial, telling the opposite story and taking the defense side. *Id.* at 20. Lanier also recounted that his girlfriend, who was present at the prison with Walker's mother, urged him not to testify against Appellant and Walker, noting that "we live around there," and threatening that she would cease to have contact with him. *Id.* at 19.

In early 2006, Appellant and Walker were scheduled to be tried jointly. Because Walker filed a motion to suppress his written and videotaped confessions to police, a suppression hearing was held on January 24, 2006, before the Honorable Renee Cardwell Hughes. Midway through the hearing, after the detectives who took his confessions testified, and his videotaped confession was played for Judge Hughes, Walker, through his attorney, approached ADA Gilson about the possibility of reaching a plea deal.

A negotiated plea agreement between Walker and the Commonwealth was arranged, under the terms of which Walker agreed to plead guilty to two counts of third-degree murder in exchange for a sentence of 30–60 years incarceration. As an additional condition of this plea agreement, Walker promised he would not testify at Appellant's trial, as reflected by the following exchange between the trial court and Walker which occurred during Walker's oral plea colloquy:

THE COURT: Now, Mr. Walker, we talked about the fact that for the two cases, the two murders and the agg [sic] assault, the conspiracy and the PIC, the Commonwealth is going to nol pros [sic] all the other charges. That's just Latin for drop the charges. And you have also promised that you will not testify in Dwayne Brown's case. Is that true?

THE DEFENDANT: Yes, Your Honor.

N.T. Suppression/Plea Hearing, 1/24/06, at 62, 63.[5]

In this colloquy, Walker also claimed, consistent with his prior confessions, that he was carrying a .44 handgun, which he fired, but, contrary to those prior declarations, indicated that Appellant was in fact present at the scene and that it was Appellant who fired a .38 caliber handgun. Walker asserted he was not telling the truth when he gave his two confessions to the police because he was not in his "right state of mind," having just been released from the hospital; however, he assured Judge Hughes that he was telling the truth in recanting those confessions before her. *Id.* at 68. Judge Hughes accepted the plea and formally imposed the negotiated sen-

---

5. This same condition is memorialized in the following excerpt from the "Written Guilty Plea Colloquy," executed the same day as the oral plea colloquy, and signed by Walker and an ADA (handwritten portion in italics):

"There is no plea bargain or agreement of any kind, except that the District Attorney promised to:

\* \* \*

Drop the charges of *Murder 1st (2cts) and to credit all time served, and will not testify in co-defendant Dwayne Brown's case. Commonwealth agrees to nolle pros all remaining bills.*
Written Plea Colloquy, 1/24/06, (R.R. at 22a).
The Commonwealth characterizes the trial court's use of the term "promise" in the oral colloquy as a "misstatement" and insists that it did not require Walker's agreement not to testify at Appellant's trial as part of the guilty plea; rather, the Commonwealth contends that it was Walker's counsel who handwrote this condition into the written plea colloquy. Commonwealth's Brief at 47 n. 27. The Commonwealth maintains that Walker's motivation for insisting on this condition was to ensure his own protection, as he did not wish to testify against Appellant, and the prosecution merely acquiesced to his request.
Appellant responds that the above-excerpted portions of the oral and written plea colloquies demonstrate that Walker's promise not to testify was an essential part of the negotiated plea agreement, and, that it does not matter which party wrote the condition into the plea colloquy, as it, nevertheless, was part of the final agreement that the trial judge and the Commonwealth endorsed. Thus, Appellant asserts it was a binding condition, with which Walker was required to comply. Appellant's Reply Brief at 4–6.
Based on our review of the transcript of Walker's plea hearing, and the above-quoted portion of the written plea agreement, we have no basis to dispute Appellant's characterization, or, conversely, to credit the Commonwealth's characterization.

tence of 30–60 years imprisonment. At the request of the Commonwealth, Judge Hughes ordered the transcript of the plea hearing sealed for the life of the sentence, or for "so long as Mr. Walker honors the terms of the negotiated plea." *Id.* at 87–88.

Because of Walker's plea, only Appellant was left to stand trial. Prior to the commencement of trial, because of Walker's potential unavailability as a witness, Appellant filed a motion *in limine* to have Walker's written and videotaped confessions to the police—admitting his own involving in the shootings, implicating his half-brothers and exculpating Appellant—admitted as substantive evidence as statements against penal interest under Pa.R.E. 804(b)(3), and also, citing, *inter alia, Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), (holding that defendant's due process right to a fair trial was violated by exclusion of out-of-court statements by another party admitting to committing the murder with which defendant was charged). Judge Hughes, who was assigned to preside over the trial, denied the motion and barred the admission of the potentially exculpatory confessions. Appellant lodged a written objection to this ruling, as well as a supplemental motion for admission of the potentially exculpatory videotape, but Judge Hughes did not alter her prior ruling.

Once the jury trial commenced, the Commonwealth called Garvin, Lawrence, and Lanier as witnesses. During their testimony, all three disavowed portions of their written statements regarding their identification of the participants in the shootings.[6]

---

**6.** After each of these witnesses testified in a manner which was inconsistent with the content of the statements transcribed by the detectives, the Commonwealth read the witnesses the relevant portions of their written statements which conflicted with their testimony and asked them whether they had provided the detectives with the specific information appearing therein. The relevant portion of this questioning, and the witnesses' responses thereto, are discussed more fully in this opinion, infra. Later in its case in chief, the Commonwealth had the detectives read, verbatim, to the jury the entirety of each witness's statement which the detectives had compiled.

Garvin, who at the time of his trial testimony was serving a 3–7 year sentence in state prison, denied on the witness stand that he was even present at the scene of the shootings, and, thus, insisted that he did not see who committed them. He claimed, instead, that he was in his house at that time, which was three or four blocks away from the scene. Garvin admitted he called Detective Lynch on January 23, 2001, and conceded he went down to the homicide division voluntarily and spoke with the detective; however, he asserted he did not tell Detective Lynch everything that Lynch wrote in the statement, and testified that Detective Lynch had "put all that together." N.T. Trial, 2/1/06, at 248–51, 299. Garvin recounted that he merely talked to Detective Lynch to express his feelings about what had happened that evening and how it had affected Garvin personally, since Williams was his best friend, and Garvin was angry that he had been shot.

Garvin stated that he only heard Appellant and Walker's name from conversations he had with people in the neighborhood in the aftermath of the shooting, as well as from Detective Lynch. He also disavowed his selection of Appellant's and Walker's photos from the photo array. Additionally, Garvin claimed he did not sign each page of the statement or under the photos, which, according to Detective Lynch, he had identified from the photo array. He declared that the signature was not his. When asked by the Commonwealth to explain how his brother's signature came to appear on the pages of the statement, Garvin at first asserted that he had never given Detective Lynch his brother's name, but later, under cross examination, admitted he had told Detective Lynch he was John Garvin and that he had signed the statement.[7]

As noted above, the Commonwealth then read Garvin's preliminary hearing testimony to the jury. Garvin then acknowledged that he had given the testimony, but stated that

7. The statement also contained certain biographical data including Garvin's date of birth, social security number, wife's name, and his address. Garvin testified he did not give any of that information to Detective Lynch.

he had made it up because Williams was a "good friend." N.T. Trial, 2/2/06 at 38. Garvin did agree with the prosecutor that, as a prisoner serving a sentence in a state institution, it was a bad thing to testify for the prosecution against another person.

When Lawrence took the stand at trial, he admitted he told Detective Lynch he saw the victims get shot by people who ran out of an alley. However, contrary to the statement memorialized by Detective Lynch, Lawrence testified he told Detective Lynch he could not see the shooters' faces as they were covered by hoods and ski masks at the time of the shooting. Lawrence insisted he had not seen Appellant or Walker at any time on the evening of the shooting, and that he never identified them to Detective Lynch as the gunmen.

Lawrence acknowledged he had signed each of the pages of the statement which Detective Lynch transcribed and, also, signed the adoption attestation form at the end, but he asserted he did so because he was told he would be permitted to leave after he signed and that he did not read what was written on any of the pages of the statement. Although Lawrence recalled looking at groups of pictures shown to him, he denied that he had selected the pictures of Appellant and Walker, and he claimed he did not print his name underneath their pictures.

Lawrence additionally claimed that he experienced duress during his two hour conversation with the police—alleging that, after he was transported to the station by Detective Lynch and another police officer, two other detectives talked "smack" and "dirty" to him, treating him as if he had done the shooting or as if he knew who the shooter was. *Id.* at 107. Lawrence maintained that the detectives became angry when he could not provide them with any information, and asserted they ratcheted up the pressure on him to tell them something by showing him an old mug shot of himself, and a recent one of his father, and, also, that they refused to let him use the bathroom while he was being questioned.

When Lanier was called to testify, he, like Garvin and Lawrence, admitted to giving a statement to detectives about the shootings, but likewise disputed the accuracy of its details. Lanier contended he did not ask to speak to the detectives about this case, but, rather, that the detectives transported him from prison and questioned him about it. Lanier testified that he told the detectives he was standing on the corner in the vicinity of the victims when they were shot, instead of across the street, and that the shooters were wearing masks which obscured their faces such that he could not identify them. Lanier specifically denied having identified Appellant and Walker as the perpetrators, as set forth in his statement. When confronted with his signature on all four pages of the statement, he, like Garvin and Lawrence, claimed not to have read the statement before signing it.

Lanier also testified that he did not remember the contents of the statement he had given to Detective Rodden. When read the statement by the Commonwealth, he disavowed telling Detective Rodden that Walker's mother had asked him not to testify or, alternatively, to "flip" if he did, and that Walker had talked to him about his statement to Detective Centeno implicating Walker in the shootings. *Id.* at 79, 84, 91–100. However, Lanier agreed that the signature which appeared on that statement was his, but, again, averred that he had not read the statement before signing it.

Lanier, who was serving a 6–12 year sentence for armed robbery in 2004, also alleged on the witness stand that, during his meeting with the members of the Philadelphia District Attorney's Office in May 2004, ADA Gilson told him that unless he testified in the manner in which Gilson wanted, he would write a letter to the parole board and make sure that Lanier served his maximum sentence. ADA McCann, who was, as indicated previously, present at that meeting, later took the stand and denied that Lanier had ever been threatened with such retaliation during that meeting or otherwise.

In the defense portion of the case, Appellant again sought to call Walker to testify as a witness. Walker was transported from prison to the courtroom, and, under oath, informed the

court that, if called, he would invoke his Fifth Amendment privilege against self incrimination. In response, Appellant renewed his request to admit Walker's potentially exculpatory confessions as evidence, and, again, the trial court denied the request.

Appellant called one witness who did not see the shooting, but recorded on videotape some of the chaos which ensued in the neighborhood afterward. Thereafter Appellant rested his case. Prior to submission of the matter to the jury, Appellant filed a motion for a judgment of acquittal, asserting that the out-of-court statements of Garvin, Lawrence, and Lanier, while admissible as substantive evidence, could not, as a matter of due process, furnish the sole basis for his conviction. Alternatively, Appellant requested an instruction to the jury that they could not, as a matter of law, return a guilty verdict if they determined that the prior statements constituted the only evidence of Appellant's participation in the shootings. The trial court denied both requests.

After deliberation, the jury returned a verdict of guilty on both counts of first-degree murder and one count each of aggravated assault, conspiracy, and possession of an instrument of crime. The jury next considered the question of whether Appellant should receive the death penalty; however, the panel deadlocked on this question, and, as a result, Appellant received two mandatory terms of life imprisonment, plus an additional sentence of 32½ to 65 years on the other offenses.

Appellant filed a post-sentence motion in which he renewed his request for a judgment of acquittal, again asserting that the evidence was insufficient to sustain his convictions, as the only evidence which supported his convictions consisted of the prior statements of Garvin, Lawrence, and Lanier, which they repudiated on the stand. Appellant alternatively sought a new trial, alleging that the trial court erred in failing to permit introduction of Walker's confessions under Pa.R.E. 804(b)(3).[8]

8. The text of this rule reads as follows:

(3) **Statement against interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal

After the trial court denied this motion, Appellant appealed to the Superior Court raising, in addition to other claims not presently before us, these same two issues.

In its opinion prepared in accordance with Pa.R.A.P. 1925(a), the Trial Court declared that the evidence, as supplied by the prior out-of-court statements of Garvin, Lawrence, and Lanier, was sufficient to demonstrate that Appellant had the specific intent to kill when he fired the gun at the three victims. The trial court noted that, while the three witnesses' trial testimony was inconsistent with their prior statements to the police, each had acknowledged making those statements and, also, that they were made voluntarily. Thus, the trial court reasoned, the statements were admissible and could be considered by the jury as substantive evidence. Consequently, because of their admissibility, the trial court deemed it proper for the jury to utilize them in assessing the credibility and reliability of the witnesses as they testified, and, because it was within the province of the jury to make credibility determinations, the jury could properly decide whether or not to credit the recanting witnesses live testimony or their prior written statements.

The trial court also determined that Walker's prior confessions were inadmissible under Pa.R.E.804 (b)(3). The court first opined that Walker's confessions were neither trustworthy nor reliable since they were contradicted by Walker during his oral testimony at the time he pled guilty. The court observed that Walker, under oath, repudiated his claim in the confessions that Appellant was not present at the scene and, also, testified that Appellant possessed a .38 caliber weapon which he fired at the victims. The trial court characterized the difference between Walker's confessions and his in-court testimony as an "irreconcilable conflict." Trial Court

liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. In a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Pa.R.E. 804(b)(3).

Opinion, 5/11/07, at 6. The trial court also found: "Walker's recantation under oath eviscerated any reliability to be afforded the earlier statements." *Id.* Ultimately, the court concluded that Walker's sworn testimony during the guilty plea colloquy was "clearly more credible than the statements given to the police which were not corroborated by the other evidence." *Id.* at 7.

Further, the trial court relied on our Court's plurality decision in *Commonwealth v. (Eldimiro) Colon*, 461 Pa. 577, 337 A.2d 554 (1975), in which Justice Roberts, joined by two other justices,[9] concluded that a portion of an unavailable witness's self-inculpatory statement to police, in which he stated that he acted alone, was not a declaration against his penal interest and, thus, was not admissible under this exception to the hearsay rule. The trial court reasoned that Walker's purported exculpation of Appellant in his confessions was "almost identical to the facts of *Colon*" and thus was not admissible pursuant to this hearsay exception. Trial Court Opinion, 5/11/07, at 7. The trial court also determined that "[Appellant's] statements ... likewise did not expose him to any additional punishment," and thus did not constitute statements against penal interest. *Id.*

The Superior Court affirmed Appellant's judgment of sentence in a divided unpublished memorandum decision.[10] *Commonwealth v. Brown*, 721 EDA 2006 (Pa. Super filed Feb. 10, 2009). In this decision, the panel majority first considered whether the trial court had properly denied Appellant's judgment of acquittal, based on his assertion that the inconsistent out-of-court statements of the prosecution witnesses were not sufficient evidence to convict him. The majority, observing that our Court had not previously addressed whether such statements, standing alone, could support a conviction, relied

9. Three justices concurred in the result, and one justice concurred separately on different grounds.

10. The Superior Court panel was composed of now President Judge Stevens, Judge Klein, and Judge Popovich.

on analogous prior cases from the Superior and Commonwealth Courts.[11]

The panel majority additionally referenced the decisions of appellate courts from 9 other states—New Jersey, Vermont, Connecticut, Delaware, Maryland, Michigan, Indiana, California, and Washington [12]—which, according to its analysis, determined that prior inconsistent statements were legally sufficient, in and of themselves, to support a conviction. Based on this collection of diverse case authority, the panel majority adjudged the out-of-court statements of Garvin, Lawrence, and Lanier sufficient evidence to support Appellant's convictions.

The panel majority next considered whether the trial court correctly determined that Walker's confessions did not meet the statement against penal interest hearsay exception set forth in Pa.R.E. 804(b)(3). The panel majority found the trial judge's decision supported by what it deemed "persuasive"

11. *See Brown*, 721 EDA 2006 at 4–7 (citing *Commonwealth v. Pitner*, 928 A.2d 1104 (Pa.Super.2007) (upholding conviction for possession of marijuana where evidence consisted only of out-of-court statements made by witness in written guilty plea colloquy, and reaffirmed by the witness during his oral plea colloquy); *Commonwealth v. Carmody*, 799 A.2d 143 (Pa.Super.2002) (ruling that prior inconsistent statement of victim of abuse which identified the defendant as the abuser was by itself sufficient to establish a *prima facie* case against defendant); *Mickel v. Pennsylvania Bd. of Prob. and Parole*, 810 A.2d 728 (Pa. Cmwlth.2002) (written and notarized statement by parolee's girlfriend stating that parolee assaulted her, which she testified at the parole revocation hearing was a lie, was sufficient substantive evidence which the Parole Board could credit in revoking parole); *Miller v. Commonwealth, Bd. of Prob. and Parole*, 105 Pa.Cmwlth. 24, 522 A.2d 720 (1987) (prior inconsistent statement of witness was substantive evidence at parole revocation hearing which the Parole Board could reasonably credit over witness's in-person testimony at the Parole Board)).

12. These cases, which are discussed further in Part II.A of this opinion, are: *State v. Mancine*, 124 N.J. 232, 590 A.2d 1107 (1991); *State v. Robar*, 157 Vt. 387, 601 A.2d 1376 (1991); *State v. Newsome*, 238 Conn. 588, 682 A.2d 972 (1996); *Acosta v. State*, 417 A.2d 373 (Del.1980); *Nance v. State*, 331 Md. 549, 629 A.2d 633 (1993); *People v. Chavies*, 234 Mich.App. 274, 593 N.W.2d 655 (1999), *overruled on other grounds, People v. Williams*, 475 Mich. 245, 716 N.W.2d 208 (2006); *Watkins v. State*, 446 N.E.2d 949 (Ind.1983); *People v. Cuevas*, 12 Cal.4th 252, 48 Cal.Rptr.2d 135, 906 P.2d 1290 (1995); and *State v. Hendrix*, 50 Wash.App. 510, 749 P.2d 210 (1988).

authority from the Superior Court. *See Commonwealth v.
(Franklin) Colon,* 846 A.2d 747 (Pa.Super.2004) (relying on
*(Eldimiro) Colon, supra* in deeming a portion of witness's
guilty plea colloquy in which he exonerated the defendant not
to be a declaration against penal interest, since statement did
not subject witness to additional criminal liability); *Common-
wealth v. Barker,* 325 Pa.Super. 357, 472 A.2d 1158 (1984)
(relying on *(Eldimiro) Colon* in determining that co-defen-
dants' statements to police that defendant was not with them
at the time they committed a robbery were not admissible as a
declaration against penal interest). Thus, the panel majority
found the confessions were not admissible, holding: "Walker's
confessions, insofar as they exculpate Brown, do not subject
Walker to any additional punishment and do not have the
safeguards of trustworthiness attributed to a statement truly
against interest." *Brown,* 721 EDA 2006, at 13.

Judge Klein filed a dissenting memorandum, finding both of
Appellant's claims meritorious. With respect to whether the
out-of-court statements of the three witnesses were sufficient
to convict, Judge Klein believed that relying solely on such
statements for conviction raised due process concerns. Judge
Klein, like the majority, recognized that no Pennsylvania case
was dispositive of this question. However, he cited appellate
decisions from two other states, Vermont and Alaska,[13] and a
decision of the federal District Court of New Mexico,[14] which
concluded that a majority of state courts have adopted a *per se*
rule that prior inconsistent statements, alone, do not consti-
tute sufficient evidence to sustain a conviction, in order to
support his assertion that the law in this area was not well
settled.

With respect to the prior out-of-court statements of the
three witnesses introduced by the Commonwealth in the pres-
ent matter, Judge Klein concluded those statements bore no
indicia of reliability since the facts contained therein were
unconfirmed. He viewed this unreliability as heightened by
the fact that each witness recanted his statement, and, also,

13. *Robar, supra; Brower v. State* 728 P.2d 645 (Alaska App.1986).

14. *United States v. Bahe,* 40 F.Supp.2d 1302 (Dist.Ct.N.M.1998).

gave reasons for having fabricated it. He further noted that the recanted statements were also arguably contradicted by the fact that there were bullets recovered from three guns used in the shooting, but each witness identified only two gunmen in their statements. For these reasons, Judge Klein concluded the evidence was insufficient as a matter of law to sustain Appellant's conviction.

In regard to the admissibility of co-defendant Jasaan Walker's videotaped confession, Judge Klein reasoned that the entire confession was against Walker's penal interest because it constituted an admission both to his participation in the murders and to the role he played with his half-brothers in conducting a large drug selling enterprise. Judge Klein observed this statement "went directly to the conspiracy charge." *Brown*, 721 EDA 2006 (Klein J., dissenting) at 8. In Judge Klein's view, this explained Walker's motivation in perpetrating the crimes, and he reasoned that, had the case gone to trial, the Commonwealth would have used the information contained therein—the fact that his half-brothers, as leaders of the drug operation, instructed him to commit the crime—as evidence against him.

Judge Klein also found Walker's confession credible, since "[i]t is hard to imagine a trier of fact concluding that a defendant would falsely accuse his own brothers and exonerate a person he only knows casually." *Id.* Lastly, Judge Klein expressed his concern that federal due process had been violated, noting "[w]hat happened here was far from even-handed" since "[t]he trial judge *allowed* statements that had no corroboration and questionable reliability ... and *refused* to admit a prior statement where there was a videotape so jurors could assess credibility." *Id.* at 9 (emphasis original).

We granted Appellant's petition for allowance of appeal to consider the following two questions:

(1) Whether [Appellant's] conviction supported solely by out-of-court statements recanted at trial violates the guarantees of due process provided by the Fourteenth Amend-

ment to the United States Constitution or Article I, Section [Nine] of the Pennsylvania Constitution?

(2) Whether codefendant Walker's statements exculpating [Appellant] constituted "statements against interest" and thus were admissible under Pa.R.E. 804(b)(3)?

*Commonwealth v. Brown,* 605 Pa. 320, 989 A.2d 881 (2009)(order). We consider these issues *seriatim* and, thus, begin with a consideration of the arguments of the parties with respect to the first issue.

## II. *Testimony of Garvin, Lawrence, and Lanier*

### A. *Appellant's Argument*

Appellant begins by noting that the question of whether out-of-court statements made by witnesses, which they recant at trial, may provide sufficient evidence to establish the defendant's guilt beyond a reasonable doubt was first raised by the United States Supreme Court in *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), elaborated on *infra.* In *Green,* the Court held that admission of two prior inconsistent statements of a witness—a statement to a police officer and a transcript of testimony at a preliminary hearing—as substantive evidence against the defendant did not violate the Confrontation Clause of the Sixth Amendment of the United States Constitution. The high Court did not resolve the question of whether such statements, by themselves, could constitute sufficient evidence for a conviction. Appellant urges our Court to answer this question by concluding that, whenever out-of-court statements, which are both uncorroborated and subsequently repudiated by their makers, comprise the entirety of the Commonwealth's identification evidence, such statements will not be sufficient to sustain a conviction under the due process clauses of either the Fourteenth Amendment to the United States Constitution or Article One, Section Nine of the Pennsylvania Constitution.

Appellant underscores the unique facts of his case, namely, that the trial court allowed the jury to consider the question of his guilt or innocence based solely on the out-of-court accusa-

tions of three witnesses, which they repudiated, juxtaposed with the trial court's exclusion of a videotaped confession of his co-defendant which exonerated him, identified two other people as participants in the shooting, and was consistent with the ballistic evidence; and, additionally, where the Commonwealth made the co-defendant unavailable as a witness at Appellant's trial due to a plea agreement under which the co-defendant had explicitly promised not to testify. Appellant stresses that he is not asking us to rule that the out-of-court inconsistent statements of the three witnesses should not have been admitted, recognizing that, under *Commonwealth v. Lively*, 530 Pa. 464, 610 A.2d 7 (1992),[15] such statements are admissible as substantive evidence. Instead, he urges that these statements, under the circumstances of this case, should be deemed insufficient as a matter of due process to establish guilt beyond a reasonable doubt.

Appellant divides his argument in support of this position into three discrete points. First, he asserts that "numerous" federal and state decisions support the principle that a prior inconsistent statement by itself is not sufficient to sustain a conviction. Appellant's Brief at 22. Appellant proffers that the "seminal case" establishing this proposition is *United States v. Orrico*, 599 F.2d 113 (6th Circuit 1979). Appellant's Brief at 23. In *Orrico*, a panel of the Sixth Circuit Court of Appeals reversed the defendant's conviction for participation in a fraudulent insurance company capitalization scheme involving check deposits. When the government's two witnesses testified that they could not remember whether the defendant instructed them to deposit certain checks, the prosecution introduced, as its sole evidence inculpating the defendant, each witness's prior inconsistent statement, which identified the defendant as the individual who ordered them to deposit the checks. Appellant notes the Sixth Circuit recognized that

15. In *Lively*, our Court established that in order for a witness's prior inconsistent statement to be admitted as substantive evidence, the statement must be "given under oath at a formal legal proceeding; or the statement had been reduced to a writing signed and adopted by the witness; or a statement that is a contemporaneous verbatim recording of the witness's statements." *Lively*, 530 Pa. at 471, 610 A.2d at 10.

these prior inconsistent statements met the minimal standards for admissibility as evidence, but found, as the statements were the government's sole evidence, they did not provide a "substantial factual basis as to each element of the crime, providing support for a conclusion of guilt beyond reasonable doubt." Appellant's Brief at 23 (quoting *Orrico*, 599 F.2d at 118). Appellant submits that the *Orrico* panel was concerned by the fact that the defendant had no opportunity to cross examine the witnesses about the accuracy of those statements at the time they made them, and, because of this lack of cross examination, the panel viewed such statements to be of limited utility in a criminal trial. Appellant's Brief at 23 (citing *Orrico*, 599 F.2d at 119).

Appellant further observes that the *Orrico* court reviewed the history of the Federal Rule of Evidence which permitted the use of prior inconsistent statements as substantive evidence, F.R.E. 801(d)(1)(A), and found that, during the process of adopting the rule, Congress acknowledged the concern of opponents who feared that the rule would permit convictions based solely on evidence which was admitted under this rule. In response, the United States Senate Committee considering the Rule stated that it was "not addressed to the sufficiency of evidence to send a case to the jury, but merely to its admissibility.... Factual circumstances could well arise where, if this was the sole evidence, dismissal would be appropriate." Appellant's Brief at 24 (quoting *Orrico*, 599 F.2d at 118, in turn quoting Senate Report No. 93–1277, 93rd Congress, 2d. Session). Appellant contends that his case is precisely that type of case envisioned by the Senate Committee.

Appellant next cites a federal district court opinion,[16] and a variety of state appellate cases, which relied on *Orrico* to conclude that a prior inconsistent statement by itself is insufficient to sustain a conviction.[17] In particular, Appellant focuses

16. *Bahe, supra.*

17. These cases include: *Brower, supra* (Alaska); *State v. Moore,* 485 So.2d 1279, 1281 (Fla.1986); *State v. Gommenginger,* 242 Mont. 265, 790 P.2d 455, 463 (1990); *State v. Ramsey,* 782 P.2d 480, 483–484 (Utah 1989)(plurality); *Commonwealth v. Clements,* 51 Mass.App.Ct.

on *Robar, supra,* a case where the Vermont Supreme Court held that, even though a prior inconsistent statement identifying the defendant as the perpetrator of a crime was admissible as evidence under Vermont law, the state could not carry its burden of proof for a criminal conviction using only that statement, unless the statement met "specific standards of reliability." Appellant's Brief at 25 (citing *Robar,* 601 A.2d at 1380).

In his second point, Appellant asserts there are inherent dangers presented whenever a case is permitted to rest exclusively on an out-of-court statement by a witness, since the jury cannot evaluate the witness's credibility at the time he or she made the statement. Hence, in Appellant's view, this creates the possibility that jurors may make negative inferences regarding the witnesses' credibility based only upon what they see of the witness in-court, without the benefit of seeing the witness's demeanor at the time he or she made the out-of-court statement. Further, the witness's prior statement is frequently read in-court by, in the Appellant's words, a "far more presentable detective," Appellant's Brief at 26; thus, this technique effectively "put[s] a suit and tie on the statement," Appellant's Brief at 27.

Appellant maintains courts have recognized that, whenever out-of-court statements are denied by their makers at trial, this calls the reliability of those statements into serious question, and the jury is forced to make a choice as to whether to believe the in-court or out-of-court statement, yet it has no rational basis upon which to make such a choice. Consequently, the jurors decide based on their own intuition, or make a guess, rather than utilize credible facts. *See* Appellant's Brief at 27–28 (quoting *State v. Pierce,* 906 S.W.2d 729, 736 (Mo. App. W.D.1995) ("When the trier of fact decides to believe a witness' prior statement rather than the in-court contradiction, that decision often is based solely on guess or intuition, not credible facts."); *Bahe,* 40 F.Supp.2d at 1310 ("The central difficulty with basing a conviction on nothing more than an

508, 747 N.E.2d 682 (2001), *aff'd Commonwealth v. Clements,* 436 Mass. 190, 763 N.E.2d 55 (2002).

out-of-court statement which has been recanted at trial is that the factfinder has no logical basis for determining which statement is true and may even be falsely persuaded by the presentation of the out-of-court statement."); *Green*, 399 U.S. at 202, 90 S.Ct. 1930 (Harlan, J. concurring) ("Inability to remember the pertinent events . . . or unwillingness to testify about them, whether because of feigned loss of memory or fear of self-incrimination, does cast . . . doubt [on the witness' earlier assertions.]")). Appellant contends that the out-of-court statements of Garvin, Lawrence, and Lanier exemplify the validity of these concerns, particularly since they were uncorroborated by other evidence, and, indeed, contradicted by the ballistics evidence and, also, by the confession of Walker which the jury was not permitted to see.

Appellant further propounds that due process is violated whenever an individual is convicted and punished without evidence of his guilt, and Appellant contends that our Court has held in this regard that this evidence " 'must be of such volume and quality as to overcome the presumption of innocence and satisfy the jury beyond a reasonable doubt.' " Appellant's Brief at 35 (quoting *Commonwealth v. Clinton*, 391 Pa. 212, 137 A.2d 463 (1958)). Appellant notes that it was in "accordance with these principles" that our Court recognized in *Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545 (1976), that a jury's verdict of guilty cannot stand whenever the evidence introduced by the Commonwealth is so lacking that the jury's verdict is the product of "surmise and conjecture." Appellant's Brief at 35 (quoting *Farquharson*, 467 Pa. at 60, 354 A.2d at 550). Appellant reminds that we elaborated on this principle in *Commonwealth v. Karkaria*, 533 Pa. 412, 419, 625 A.2d 1167, 1170 (1993), when we held that, whenever "evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury cannot be permitted to return such a finding." Appellant claims these principles are applicable to his case, as the out-of-court statements, by themselves, were

"too unreliable to support a finding of guilt beyond a reasonable doubt." Appellant's Brief at 35.[18]

18. In his Concurring and Dissenting Opinion, Chief Justice Castille suggests that this aspect of Appellant's argument, and his concomitant citations to and quotations from our Court's decisions in *Farquharson* and *Karkaria*, constitute a claim that the jury's verdict was against the weight of the evidence. Concurring and Dissenting Opinion (Castille, C.J.) at 189, 52 A.3d at 1189. We must respectfully disagree.

First, Appellant has been very consistent throughout his brief in describing his due process claim as resting on the contention that prior inconsistent statements, standing alone, are insufficient evidence to prove guilt beyond a reasonable doubt, Appellant's Brief at i, 12, 17–19, 22, 30, and he repeatedly argues how, from his perspective, relevant case authority from the United States Supreme Court and from other jurisdictions supports this assertion, *id.* at 22, 24, 26, 28. Indeed, in the heading of the argument section of Appellant's brief in which Appellant's citation to *Farquharson* and *Karkaria* appears, he summarizes the central contention of his entire argument, thusly:

Appellant's conviction was based on insufficient evidence in violation of the due process guarantees set forth in the Fourteenth Amendment to the United States Constitution and in Article 1, Section 1 of the Pennsylvania Constitution, where that conviction was supported solely by out-of-court statements recanted by Appellant's accusers at trial.

Appellant's Brief at 19. Moreover, Appellant quotes at length from *Karkaria*, a case in which, as we explain *infra*, a criminal conviction was reversed for insufficient evidence.

Further, although the Chief Justice considers an assertion that a jury verdict was the product of surmise and conjecture as challenging only the weight of the evidence, *see* Concurring and Dissenting Opinion (Castille, C.J.) at 189, 52 A.3d at 1189 (quoting *Farquharson* and citing *Commonwealth v. Sanchez* 614 Pa. 1, 36 A.3d 24 (2011) and *Commonwealth v. DeJesus*, 580 Pa. 303, 310, 860 A.2d 102, 107 (2004)), the holding of *Farquharson* has been applied by our Court in other cases in a manner which indicates that whenever a jury verdict is based on evidence so unreliable that it renders the verdict a product of surmise and conjecture, the evidence is insufficient, as a matter of law, to sustain the verdict.

In *Farquharson*, the defendant was convicted of first-degree murder and, on appeal to this Court, she urged that she should receive a new trial because the testimony of the chief Commonwealth witness was so unreliable and contradictory that the jury should have rejected it as not credible. Although, because the defendant was requesting a new trial, her claim could reasonably be viewed as having been a challenge only to the weight of the evidence, the precise nature of her challenge was never clearly established in the opinion. Notably, however, as support for her contention, the defendant, in seeking relief from our Court, relied chiefly on a Superior Court decision, *Commonwealth v. Bennett*, 224 Pa.Super. 238, 303 A.2d 220 (1973), which reversed a criminal conviction on the grounds of insufficient evidence.

The *Farquharson* Court reiterated that it was not the job of an appellate court to "weigh the evidence and ... substitute our judgment for that of the finder of fact," since "[t]o do so would require an assessment of the credibility of the testimony and that is clearly not our

function." *Farquharson*, 467 Pa. at 60, 354 A.2d at 550. Nevertheless, the Court also specifically recognized that "[t]his concept . . . must be distinguished from an equally fundamental principle that a verdict of guilt may not be based on surmise or conjecture," and, citing *Bennett*, noted that "[f]ollowing this principle courts of this jurisdiction have recognized that where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding." *Farquharson*, 467 Pa. at 60, 354 A.2d at 550. Thus, while the Court ultimately did not find *Bennett* to be controlling of the matter before it, it nevertheless recognized that "the *Bennett* principle" applies "where the party having the burden of proof presents testimony to support that burden which is either so unreliable or contradictory as to make any verdict based thereon obviously the result of conjecture and not reason." *Farquharson*, 467 Pa. at 60–61, 354 A.2d at 550.

Although it may not have been entirely clear whether the *Farquharson* Court was applying these principles to resolve a sufficiency challenge or a weight of the evidence claim, our Court has subsequently quoted and applied this language in analyzing claims which involved only challenges to the sufficiency of the evidence. *See, e.g., Commonwealth v. Duncan*, 473 Pa. 62, 68, 373 A.2d 1051, 1054 (1977); *Commonwealth v. Harris*, 479 Pa. 131, 136, 387 A.2d 869, 872 (1978); *Commonwealth v. Whack*, 482 Pa. 137, 140–141, 393 A.2d 417, 419 (1978); *Commonwealth v. Hudson*, 489 Pa. 620, 628, 414 A.2d 1381, 1385 (1980); *Commonwealth v. Galloway*, 495 Pa. 535, 434 A.2d 1220 (1981).

Finally, in *Commonwealth v. Smith*, 502 Pa. 600, 604, 467 A.2d 1120, 1122 (1983), our Court, in discussing the defendant's sufficiency of the evidence claim based on contradictions in the testimony of the Commonwealth's witnesses, cited *Farquharson* and the above-referenced post-*Farquharson* cases, among others, to note that "[w]e have . . . made exception to the general rule that the jury is the sole arbiter of the facts where the testimony is so inherently unreliable that a verdict based upon it could amount to no more than surmise or conjecture." The *Smith* Court went on to quote the *Farquharson* Court's observation that *Bennett* and other Pennsylvania courts "have recognized that where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding." *Smith*, 502 Pa. at 605, 467 A.2d at 1122. Our Court did not ultimately find that the contradictory witness testimony in that case rendered the jury verdict a product of conjecture, and, hence, rejected the defendant's sufficiency claim.

Subsequently, however, in *Karkaria*, our Court explicitly relied on *Smith* and *Farquharson* when setting forth the relevant law governing our review of Appellant's assertion that "the testimony presented to the jury was so unreliable and contradictory that their verdict could only have been arrived at through speculation and conjecture," *id*, 533 Pa. at 418, 625 A.2d at 1170, which our Court unambiguously deemed to be a challenge to the sufficiency, and not the weight, of the evidence. After considering the evidence adduced at trial, which consisted of testimony of a single Commonwealth witness about repeated sexual assaults she claimed the defendant had subjected her to, the Court concluded, "in

In his third point, Appellant suggests that when recanted out-of-court statements comprise the only evidence of a defendant's guilt presented at trial, the burden of proof has impermissibly shifted to the defendant. Appellant posits that, in such a situation, the Commonwealth need no longer convince the jury that its witnesses' sworn testimony is true, but, instead, it is the defense who must now try to convince the jury that the Commonwealth's witnesses are telling the truth—in essence converting, in the eyes of the jury, the Commonwealth's recanting witnesses to defense witnesses which the jury expects the defendant to support.[19]

keeping with our standard of review as set forth in *Smith* and Farquharson, we are compelled to conclude that the evidence presented at trial when carefully reviewed in its entirety, is so unreliable and contradictory that it is incapable of supporting a verdict of guilty, and thus, is insufficient as a matter of law." *Karkaria*, 533 Pa. at 422, 625 A.2d at 1172. Our Court therefore recognized that, in those extreme situations where witness testimony is so inherently unreliable and contradictory that it makes the jury's choice to believe that evidence an exercise of pure conjecture, any conviction based on that evidence may be reversed on the grounds of evidentiary insufficiency, since no reasonable jury could rely on such evidence to find all of the essential elements of the crime proven beyond a reasonable doubt. Consequently, Appellant's present assertion that the prior inconsistent statements of the Commonwealth's trial witnesses, repudiated at trial, were too unreliable to establish, as a matter of law, his guilt beyond a reasonable doubt is a claim which implicates the sufficiency of the evidence.

19. In its brief filed in support of Appellant, Amicus, the Defender Association of Philadelphia, largely reiterates the arguments of Appellant, but additionally suggests that the majority of jurisdictions have adopted a rule which precludes the use of prior inconsistent statements to establish an essential element of the crime, such as identity of the perpetrator, unless there is independent evidence which corroborates that element. See Amicus Brief at 14–16 (citing *State v. Giant*, 307 Mont. 74, 37 P.3d 49, 59 (2001), *overruled in part on other grounds*, *State v. Swann*, 337 Mont. 326, 160 P.3d 511 (2007); *Brower, supra;* *Pierce, supra; Baugh v. State*, 961 So.2d 198 (Fla.2007); *Ramsey, supra*, (plurality)). Amicus acknowledges that some jurisdictions like New Jersey, (*Mancine, supra* ) and Vermont (*Robar, supra* ) allow uncorroborated, out-of-court inconsistent statements to form the basis for a conviction if the statements were made under circumstances establishing their reliability and the defendant can cross examine the maker in-court; however, Amicus does not support the adoption of such a test because, in its view, the test is too subjective and hard for courts to apply consistently, leading to what it terms *"ad hoc* judicial determinations." Amicus Brief at 21.

The Commonwealth responds by first pointing out that Pennsylvania law does not allow all prior inconsistent statements to be admitted at trial as substantive evidence, but, rather, pursuant to *Lively, supra,* and Pa.R.E. 803.1(1), only those previous statements made by witnesses who are available for cross-examination at trial, and then only if the statements were "given under circumstances indicating reliability," i.e., under oath and penalty of perjury, or in a writing signed and adopted by the maker, or recorded verbatim, contemporaneously with their making. Commonwealth's Brief at 19. The Commonwealth contends that the statements of Garvin, Lawrence, and Lanier met these criteria and, as a result, were properly admitted at Appellant's trial.

The Commonwealth asserts that the reliability of these statements was further bolstered because: (1) each statement corroborated the others and was consistent in key details; (2) each witness identified, without prompting, Appellant and Walker as the shooters; (3) none of the witnesses had any motive to falsely implicate either Appellant or Walker; (4) the statements were given close to the time of the shooting; (5) there was evidence that the witnesses were subjected to threats and pressure to repudiate their statements; (6) the witnesses all knew Appellant and Walker and had a motive to disavow their statements, and (7) all of the witnesses selectively forgot only those portions of their statements which implicated Appellant. The Commonwealth argues that, since the reliability of the out-of-court statements was established, they could properly be considered by the jury, along with the witnesses' trial testimony, without due process being offended.

Also, Amicus notes that other jurisdictions simply evaluate whether such statements can furnish sufficient evidence to convict in accordance with their standard sufficiency of the evidence analysis. However, Amicus characterizes this approach as "decidedly the minority view." Amicus Brief at 18. Amicus urges that we adopt what it characterizes as "the majority view and require independent corroboration of an element of the crime where this element is not established by trial testimony but only by a prior inconsistent statement disavowed by the declarant of that statement at trial." Amicus Brief at 19.

The Commonwealth further avers that Appellant's complaints regarding the jury's inability to view the witness at the time they gave the out-of-court statement is really an effort to resurrect the archaic "orthodox rule," an evidentiary rule allowing prior inconsistent statements to be used, with proper cautionary instructions, to impeach the testifying witness, but prohibiting their use as substantive evidence. The Commonwealth notes that our Court in *Commonwealth v. Brady*, 510 Pa. 123, 507 A.2d 66 (1986), discarded this rule in Pennsylvania law because it had been discredited, and an increasing number of jurisdictions were abandoning it.[20] The Commonwealth suggests that due process does not bar a jury from drawing conclusions about the reliability of the witnesses at the time they gave their statements, even though the jurors did not see the statements being made, as the testimony of every witness at trial is always an evaluation of the witnesses' "hindsight account" of past events which the jurors must evaluate in the present time when they observe the witness testifying. Commonwealth's Brief at 22. The Commonwealth proffers that the jury has the opportunity to observe the witness at trial, under oath and subject to cross examination, and, thus, can evaluate the witness's veracity, both in explaining the past statement and his or her present trial testimony, which gives the jury a basis to decide which version to credit.

The Commonwealth also disputes the contention that the use of prior inconsistent statements as evidence results in a shifting of the burden of proof to the defense. The Commonwealth insists that, to the contrary, its burden becomes more difficult in such circumstances since such testimony favors the defendant and has the effect of discrediting its own case.

20. In 1970, at the time of the United States Supreme Court decision in *Green*, the "orthodox rule" was followed by a majority of jurisdictions. The three basic concerns undergirding the rule's prohibition of the use of out-of-court statements as substantive evidence, as recounted by the high Court, were: "the statement may not have been made under oath; the declarant may not have been subjected to cross-examination when he made the statement; and the jury cannot observe the declarant's demeanor at the time he made the statement." *Green*, 399 U.S. at 154, 90 S.Ct. 1930.

The Commonwealth suggests that what Appellant is actually seeking is for our Court to overrule our *Brady* and *Lively* decisions. The Commonwealth claims that the prior inconsistent statements of its three witnesses met the criteria for admissibility as substantive evidence under these decisions and that, as we have ruled in past cases, such statements were adequate evidence sufficient to establish Appellant's guilt. *See* Commonwealth's Brief at 24 (citing *Commonwealth v. Hanible*, 575 Pa. 255, 260, 836 A.2d 36, 39 (2003), and *Commonwealth v. Hall*, 523 Pa. 75, 565 A.2d 144 (1989)). The Commonwealth proffers that, were we to accept any of Appellant's arguments in favor of reversal of his conviction, we would be required to overturn both *Brady* and *Lively*.

The Commonwealth next urges that we reject what it describes as Appellant's proposed *per se* rule that prior inconsistent statements standing alone are, as a matter of law, insufficient to sustain a conviction. The Commonwealth contends there is no justification for adopting such a rule because it "contravenes the well-established standard and scope of review for sufficiency of the evidence." Commonwealth's Brief at 26. According to the Commonwealth, sufficiency review proceeds in a case-by-case fashion and, thus, by necessity, it will depend on the unique nature of the evidence introduced at trial in the particular case under examination, as well as the jury's consideration of it. Consequently, in the Commonwealth's view, a uniform rule which requires reversal of a conviction in every instance that prior inconsistent statements are used to support a conviction would disregard the integrity of a jury verdict since it would mandate an automatic conclusion, on appellate review, that the jury was wrong to rely on such statements in reaching a verdict without allowing any further inquiry into the probative value of the evidence.

The Commonwealth maintains that prior inconsistent statements are like every other type of trial evidence in that it is up to the jury to determine whether or not to credit them and to resolve any discrepancies between them and the other evidence. In the Commonwealth's view, resolving discrepancies or contradictions between various pieces of evidence has

no part in a traditional sufficiency review, as the function of an appellate court is not to reweigh or reassess the reliability of evidence, or to reevaluate the credibility determinations of the finder-of-fact. Further, the Commonwealth posits that, in conducting a sufficiency review, all of the evidence of record is considered under the same uniform standard—namely, it is viewed in the light most favorable to the prosecution as verdict winner—and no particular part of the evidence is excluded in this process; thus, there is no reason to treat prior inconsistent statements according to a different evidentiary standard.

The Commonwealth suggests that there are also sound policy reasons for not adopting such a *per se* rule, as, from its perspective, it would serve only to reward defendants who are successful in causing eyewitnesses to "flip." Commonwealth's Brief at 29. The Commonwealth notes that, in such circumstances, even if the Commonwealth successfully used the prior inconsistent statements from witnesses who appeared in-court to establish each element of the offenses charged, the *per se* rule would require that the defendant be acquitted. Such a rule, the Commonwealth argues, "would create an irresistible incentive to defendants or their associates to coerce cooperating witnesses to recant, exacerbating the widespread and well-chronicled problem of witness intimidation, which pervades the criminal-justice system, particularly in cases involving violent crimes." Commonwealth's Brief at 29–30. This, the Commonwealth propounds, would actually undermine due process rather than protect it.

The Commonwealth disputes that a majority of jurisdictions have adopted the view that a witness's prior inconsistent statement, which is disavowed at trial by the witness, is not sufficient to support a conviction. The Commonwealth asserts that most jurisdictions have, in fact, refused to adopt such an unqualified rule and have, in actuality, held that a prior inconsistent statement is sufficient evidence to sustain a conviction.[21] Next, the Commonwealth distinguishes the facts of

---

21. In support of this contention, the Commonwealth cites the same cases as the Superior Court majority, see *supra* note 12, as well as some

*Orrico,* as the Commonwealth maintains the out-of-court statements in that case would not have been admissible under *Brady* or *Lively* because the witnesses who gave them could not remember making them. The Commonwealth avers that this lack of recollection meant the jury did not have two versions of the events in question to evaluate. By contrast, according to the Commonwealth, in the case at bar, the prior inconsistent statements of the witnesses were previously signed and adopted by the witnesses who were subject to cross examination at trial; hence, they were sufficiently reliable and trustworthy for the jury to consider.

The Commonwealth further assails the declaration by the United States District Court in *Bahe* that the majority of state courts have adopted a *per se* rule that prior inconsistent statements, by themselves, recanted at trial do not constitute sufficient evidence to support a conviction. The Commonwealth points out that the *Bahe* court cited decisions from only seven states, and that some of the decisions cited, like *Brower* and *Pierce,* did not establish a *per se* rule because later cases from those jurisdictions upheld convictions based on prior inconsistent statements. The Commonwealth also notes that the *Bahe* court itself did not adopt a *per se* rule. With respect to decisions such as *Mancine* and *Robar,* the Commonwealth disputes that those decisions establish special reliability tests for prior inconsistent statements, and it asserts that the evidentiary rules of those states, which are similar to Pa.R.E. 804(b)(3), govern admissibility of such statements; the fact that those rules require that evidence meet certain conditions for admission provides the necessary corroboration of such statements and assures their reliability. The Commonwealth contends that, in reality, it is only five states which impose a special standard of review, and it avers that the clear majority of states treat prior inconsistent statements in the same

additional case authority, including *Bodine v. State,* 737 P.2d 1072 (Alaska Ct.App.1987); *Gibbons v. State,* 248 Ga. 858, 286 S.E.2d 717 (1982); *State v. Tomas,* 84 Hawaiʻi 253, 933 P.2d 90 (App.1997); *People v. Thomas,* 354 Ill.App.3d 868, 290 Ill.Dec. 316, 821 N.E.2d 628 (2004); *Commonwealth v. Clements,* 436 Mass. 190, 763 N.E.2d 55 (2002); and *State v. Johnson,* 262 S.W.3d 257 (Mo.App. W.D.2008).

manner as any other type of substantive evidence when conducting a sufficiency of the evidence analysis.

## C.  *Analysis*

Having considered the respective arguments of the parties and amicus, we turn now to the question of whether Appellant's criminal conviction violated the due process protections afforded by the Fourteenth Amendment to the United States Constitution,[22] because it was based exclusively on evidence consisting of the out-of-court statements of the three eyewitnesses, Garvin, Lawrence and Lanier, who identified Appellant and Walker in their statements as the shooters, but later recanted that identification at trial.  The issue of whether Appellant's conviction under these circumstances offends due process is a pure question of law for which our standard of review is *de novo,* and our scope of review is plenary.  *Commonwealth v. Reyes,* 600 Pa. 45, 53, 963 A.2d 436, 441 (2009); *Commonwealth v. Colavita,* 606 Pa. 1, 21, 993 A.2d 874, 886 (2010).

As our Court has observed: "[T]he due process clauses of the United States and Pennsylvania constitutions . . ., generally, embody the principle of fundamental fairness, entitling every individual to be free from arbitrary or oppressive government conduct." *Kratsas,* 564 Pa. at 49, 764 A.2d at 28.  In ascertaining whether a particular governmental proceeding or course of conduct undertaken by the government is violative of these constitutional guarantees of due process, it must be determined "whether the challenged proceeding or conduct 'offends some principle of justice so rooted in the

22.  Although Appellant has urged our Court to conclude that prior inconsistent statements are insufficient to sustain a conviction under the due process clause of both the United States and Pennsylvania Constitutions, he does not advance nor develop in his brief any discrete argument suggesting that our Court should, in addressing his contention, recognize and apply broader due process protections under Article One, Section Nine of the Pennsylvania Constitution.  Consequently, for purposes of our present analysis, we consider the protections afforded by both provisions of our organic charters of governance to be coextensive.  *Commonwealth v. Hall,* 574 Pa. 233, 252, 830 A.2d 537, 548–549 (2003);  *Commonwealth v. Kratsas,* 564 Pa. 36, 49 n. 5, 764 A.2d 20, 27 n. 5 (2001).

traditions and conscience of our people as to be ranked as fundamental.'" *Id.* (quoting *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)).

The United States Supreme Court has never squarely addressed the question of whether a criminal conviction, grounded entirely on out-of-court statements recanted by their makers at trial, constitutes a violation of the defendant's due process rights secured by the Fourteenth Amendment to the United States Constitution which guarantees that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law," United States Constitution Amendment XIV.

The high Court in *Green* observed "that considerations of due process ... might prevent convictions where a reliable evidentiary basis is totally lacking," 399 U.S. at 163 n. 15, 90 S.Ct. 1930.[23] The high Court, however, did not address the question of whether, as a matter of due process, the inconsistent statements at issue were insufficient to convict the defendant, as it had accepted review only to consider whether the use of the statements violated the Sixth Amendment's Con-

**23.** In a concurring opinion, Justice Harlan articulated what he perceived to be the due process concerns raised by using out-of-court statements, alone, as substantive evidence to convict whenever the makers of the statements were **not available** at trial for cross examination:

> I would not permit a conviction to stand where the critical issues at trial were supported only by *ex parte* testimony not subjected to cross-examination, and not found to be reliable by the trial judge.... It will, of course, be the unusual situation where the prosecution's entire case is built upon hearsay testimony of an unavailable witness. In such circumstance the defendant would be entitled to a hearing on the reliability of the testimony.... Due process also requires that the defense be given ample opportunity to alert the jury to the pitfalls of accepting hearsay at face value and the defendant would, of course, upon request be entitled to cautionary instructions.

*Green*, 399 U.S. at 186, n. 20, 90 S.Ct. 1930. While Justice Harlan did not explicitly express a view as to whether due process is offended by a conviction resting on out-of-court statements, when the witness who made the statements is available for cross examination by the defendant, he did opine, with respect to the case before the Court, that if the circumstances surrounding the juvenile witness's making of the statements were too unreliable, then "admission requires reversal as a matter of due process." 399 U.S. at 189, 90 S.Ct. 1930.

frontation Clause. Instead, it remanded the case for the California Supreme Court to consider the question of evidentiary sufficiency in the first instance.

Subsequent to *Green*, while not having occasion to definitively resolve the instant due process question, the high Court has, nevertheless, set forth a minimum due process standard which evidence presented by the government must meet under the Fourteenth Amendment. In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Court specified that the due process standard it articulated previously in *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), which firmly established the principle that "the Due Process Clause ... protects [the accused] against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged,'" was also the governing standard which a federal court was to apply in reviewing a state prisoner's *habeas corpus* claim that the evidence was insufficient to support his or her conviction. *Jackson*, 443 U.S. at 316, 99 S.Ct. 2781. The Court explained:

> The *Winship* doctrine requires more than simply a trial ritual. A doctrine establishing so fundamental a substantive constitutional standard must also require that the factfinder will rationally apply that standard to the facts in evidence. A "reasonable doubt," at a minimum, is one based upon "reason." Yet a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt, and the same may be said of a trial judge sitting as a jury.... Under *Winship*, which established proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, it follows that when such a conviction occurs in a state trial, it cannot constitutionally stand.

*Jackson*, 443 U.S. at 317–318, 99 S.Ct. 2781 (footnotes and citations omitted).

The Court further developed that "the critical inquiry" for a court which is making such a sufficiency determination is:

whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether **it** believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, **any** rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review **all of the evidence** is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necessary to guarantee the fundamental protection of due process of law.

*Jackson,* 443 U.S. at 318–319, 99 S.Ct. 2781 (citations and footnotes omitted) (emphasis original). The Court emphasized that, in applying this standard, a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326, 99 S.Ct. 2781.

The high Court described this standard as "the constitutional minimum required to enforce the due process right established in *Winship.*" *Jackson,* 443 U.S. at 319 n. 12, 99 S.Ct. 2781. Thus, *Jackson* establishes the sufficiency review required by the Fourteenth Amendment to determine whether a criminal conviction has violated due process. *See Tibbs v. Florida,* 457 U.S. 31, 45, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982) ("We held in *Jackson* that the Due Process Clause forbids any conviction based on evidence insufficient to persuade a rational factfinder of guilt beyond a reasonable doubt. The Due Process Clause, in other words, sets a lower limit on an

148

appellate court's definition of evidentiary sufficiency."). Although *Jackson* sets a minimum standard, states may, of course, under their own laws or constitution, elect to utilize a different, more stringent standard of sufficiency review. *See, e.g., Hale v. State,* 343 Ark. 62, 31 S.W.3d 850 (2000) (declining to adopt the *Jackson* test and preserving the traditional test under Arkansas law which requires "substantial" evidence to support a jury verdict in a criminal case).

This Court follows the *Jackson* approach in determining whether evidence is sufficient to support a conviction beyond a reasonable doubt. First, our standard of review, like the *Jackson* standard, recognizes the proper regard an appellate court must give to the fact-finder's evaluation of all of the evidence received at trial and, therefore, requires scrutiny of the totality of that evidence "in the light most favorable to the Commonwealth, as verdict winner," *Commonwealth v. Sanchez,* 589 Pa. 43, 58, 907 A.2d 477, 486 (2006), and to "draw all reasonable inferences in favor of the Commonwealth." *Commonwealth v. Fisher,* 491 Pa. 231, 234, 420 A.2d 427, 428 (1980). Further, our Court's determination of the ultimate question of evidentiary sufficiency parallels the central inquiry under the *Jackson* standard, namely, whether any "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781; *see also Commonwealth v. Reed,* 605 Pa. 431, 436, 990 A.2d 1158, 1161 (2010) (sufficiency determination depends on whether a reasonable trier of fact could have found every element of the crime was established beyond a reasonable doubt).[24] Consequently, because our Court's well established standard of sufficiency review essentially mirrors the standard articulated by the high Court in *Jackson* for determining whether a criminal conviction violates the due process guarantees of the Fourteenth Amendment to the

**24.** In *McDaniel v. Brown,* 558 U.S. 120, 130 S.Ct. 665, 175 L.Ed.2d 582 (2010), the high Court noted there was no practical difference between a "reasonable" trier-of-fact standard and the *Jackson* "rational" trier-of-fact standard, observing that "a *reasonable* jury could hardly be convinced of guilt unless it found each element satisfied beyond a reasonable doubt." *Id.* at 672 n. 4 (emphasis original).

United States Constitution, we analyze Appellant's due process challenge to his conviction in accordance with this standard.

The United States Supreme Court, in applying the *Jackson* standard, has never held that due process is violated whenever evidence of a particular nature is the sole support for a criminal conviction. The high Court has indicated that the *Jackson* standard requires scrutiny of all evidence received at trial in relation to the specific offense charged. *See Jackson*, 443 U.S. at 318–19, 99 S.Ct. 2781 ("critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be ... to determine whether the **record** evidence could reasonably support a finding of guilt beyond a reasonable doubt" (emphasis supplied)). Therefore, categoric classifications of certain types of evidence as too unreliable and, thus, *per se* insufficient to sustain convictions, is seemingly antithetical to the type of individualized sufficiency review contemplated by the high Court for determining whether a conviction violates due process. This is particularly so in light of the fact that the high Court has stressed that the finder-of-fact's individualized assessment of the credibility of the trial evidence is, as a general principle, not to be questioned by an appellate court as part of its review, even if the evidence is conflicting. *See Schlup v. Delo*, 513 U.S. 298, 330, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) ("[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review."); *House v. Bell*, 547 U.S. 518, 538, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006) ("When confronted with a challenge based on trial evidence, courts presume the jury resolved evidentiary disputes reasonably so long as sufficient evidence supports the verdict."); *McDaniel, supra* note 23, (mere inconsistency and conflicts in witnesses testimony, by itself, will not furnish a basis for an appellate court to reverse a conviction under *Jackson* on the grounds of evidentiary insufficiency).

Similarly, our Court has repeatedly refused to endorse the proposition that a particular type or class of evidence which is admitted at trial is, because of its intrinsic nature, insufficient

as a matter of law to uphold a conviction—even if it is the only evidence adduced on the question of guilt. *See, e.g., Commonwealth v. Duncan,* 473 Pa. 62, 373 A.2d 1051 (1977) (holding that testimony of a single eyewitness, alone, was sufficient to convict even though it conflicted with other trial testimony); *Commonwealth v. Riggins,* 478 Pa. 222, 386 A.2d 520 (1978) (rejecting argument that the uncorroborated dying declaration of the victim identifying defendant was insufficient as a matter of law, on the grounds that, to adopt such a rule, would be to determine that such declarations automatically should be given less weight than other kinds of admissible evidence); *Commonwealth v. Cooper,* 596 Pa. 119, 130, 941 A.2d 655, 662 (2007) ("[C]ircumstantial evidence alone can be sufficient to prove every element of an offense."). Even when there are well recognized concerns regarding the reliability of evidence, such as in instances where evidence of guilt is provided by a criminal accomplice who is deemed a corrupt and polluted source, our Court has not categorically regarded all such evidence to be so inherently unreliable that it cannot, by itself, support a verdict of guilt. *See Commonwealth v. Mikell,* 556 Pa. 509, 516, 729 A.2d 566, 570 (1999) ("[A] verdict may be predicated upon the uncorroborated testimony of an accomplice."). Instead, our Court considers questions regarding the reliability of the evidence received at trial to be within the province of the finder-of-fact to resolve, and our Court will not, on sufficiency review, disturb the finder-of-fact's resolution except in those exceptional instances, as discussed previously, where the evidence is so patently unreliable that the jury was forced to engage in surmise and conjecture in arriving at a verdict based upon that evidence. *Karkaria,* 533 Pa. at 419, 625 A.2d at 1170; *see also Commonwealth v. Fahy,* 512 Pa. 298, 308, 516 A.2d 689, 694 (1986) (same). Thus, Appellant's proposed sweeping rule that, in every case in which the Commonwealth's only evidence in support of a conviction is comprised of the prior inconsistent statements of its witnesses, which are repudiated at trial, such evidence is, *ipso facto,* insufficient as a matter of law, stands in stark contrast to our Court's traditional determination of evidentiary sufficiency. Such a determination is fundamentally an individ-

ualized, case-by-case endeavor where the nature and type of evidence introduced at trial is measured according to the aforementioned legal benchmarks.

Of the various states which allow out-of-court inconsistent statements of a witness to be used as substantive evidence at trial, the highest courts in only three of those states—Florida,[25] Montana,[26] and Massachusetts [27]—have adopted a *per se* rule that deems such statements, standing alone, legally insufficient evidence to convict.[28] These courts require some additional corroborating evidence of either the defendant's guilt, or of the specific element of the crime which the inconsistent statements are being introduced to establish. Intermediate appellate courts in two other states—Alaska,[29] and Missouri [30] —have also made similar blanket determinations regarding the evidentiary value of otherwise admissible prior inconsistent statements for sufficiency purposes and also impose corroboration requirements.[31][32]

25. *See Baugh, supra.*

26. See *Giant, supra.*

27. See *Clements, supra.*

28. The Supreme Court of Louisiana also has barred convictions which are supported solely by prior inconsistent statements, as under Louisiana law such statements are regarded as hearsay and not admissible as substantive evidence. *See State v. Allien,* 366 So.2d 1308, 1313 (La. 1978). Additionally, New Mexico's Supreme Court has suggested, in *dicta,* that under certain circumstances convicting an individual on the basis of prior inconsistent statements which are uncorroborated "may, as a matter of due process, be insufficient as the sole basis for a conviction." *State v. Orosco,* 113 N.M. 780, 833 P.2d 1146, 1154 (1992).

29. *See Brower, supra.*

30. *See Pierce, supra.*

31. The *Ramsey* decision of the Utah Supreme Court, *see supra* note 17, was a plurality opinion, and it has never commanded the views of a majority of that Court; consequently it is not included in this tally.

32. In adopting this blanket rule, most of these state courts have either expressly followed the Sixth Circuit's decision in *Orrico, supra,* or cited its rationale approvingly. However, *Orrico's* conclusion that, when prior inconsistent statements are offered as the only evidence to establish the central elements of the crime, they do not establish the defendant's guilt beyond a reasonable doubt, has not been accepted in the other federal circuits. *See, e.g., Ticey v. Peters,* 8 F.3d 498 (7th

By contrast, the highest courts in 6 states—Maryland,[33] Indiana,[34] California,[35] Hawaii,[36] North Dakota,[37] and Georgia [38] —have found prior out-of-court statements to be, in and of themselves, sufficient evidence to sustain criminal convictions, without requiring other corroborating evidence, and despite the in-court disavowal of the statements by their makers. These tribunals espouse the view that, so long as a witness who makes a prior statement testifies at trial and is subject to cross examination, thereby enabling the finder-of-fact to both hear the witness's explanation for making the prior statement, and evaluate the truthfulness of the in-court recantation based on observations of the witness, it is the rightful role of the finder-of-fact to resolve the discrepancy between the out-of-court statement and the recantation. Where the finder-of-fact had a reasonable basis to credit the witness's out-of-court statements over the in-court recantation, these courts have upheld convictions based solely on the out-of-court statements.[3940]

Cir.1993) (finding prior inconsistent statement of rape victim identifying her brother as the assailant, which she recanted at trial, sufficient for trial judge to convict). Indeed, a different panel of the Sixth Circuit seemingly reached a result opposite to *Orrico*, in a subsequent case, *see U.S. v. Woods*, 613 F.2d 629 (6th Cir.1980) (rejecting sufficiency of the evidence challenge to conviction based on alleged inadmissibility of prior inconsistent grand jury testimony which was sole evidence presented on the question of guilt).

33. *See Nance, supra.*

34. *See Watkins, supra.*

35. *See Cuevas, supra.*

36. *State v. Eastman*, 81 Hawai'i 131, 913 P.2d 57 (1996).

37. *State v. Igoe*, 206 N.W.2d 291 (N.D.1973).

38. *Gibbons, supra.*

39. The Delaware Supreme Court in *Acosta, supra,* expressed its agreement with the general principle that the state could establish its case through the impeachment of its own witnesses by their prior inconsistent statements, and the weight to be accorded those statements was a matter within the discretion of the jury; however, that court also suggested that whenever such out-of-court inconsistent statements are introduced as evidence, the jury be advised that it "should be particularly careful when there is no evidence to corroborate the inconsistent out-of-court statement, but that the jury can convict on such statement if it is satisfied beyond a reasonable doubt it is true." 417 A.2d at 378.

Intermediate appellate courts in three other states—Illinois,[41] Michigan,[42] and Washington,[43]—have also upheld convictions based on properly admitted prior inconsistent statements alone, as long as the makers of the statements testify in-court and are subject to cross examination, as these courts also regard such statements to be sufficient evidence from which the finder-of-fact can convict.

A small number of other jurisdictions—while regarding a properly admitted prior inconsistent statement as legally sufficient evidence to support a conviction, even when such a statement is the only evidence offered against a defendant— also carefully scrutinize whether the trial evidence supports the reliability of the inconsistent statement by examining both the content of the statement and the circumstances surrounding its making. These jurisdictions are: New Jersey,[44][45] Vermont,[46] and Connecticut.[47] Nevertheless, these jurisdictions align with the majority of jurisdictions which have not deemed prior inconsistent statements so unreliable, as a class, that they are insufficient as a matter of law to be the sole evidence

40. Other state high courts have upheld convictions based only on prior inconsistent statements which were admitted into evidence under other exceptions to the hearsay rule. *See People v. Fratello,* 92 N.Y.2d 565, 684 N.Y.S.2d 149, 706 N.E.2d 1173, 1178 (1998) (sustaining a conviction based only on a prior inconsistent statement which was admitted into evidence under the excited utterance exception to the hearsay rule); *Fernandez v. State,* 805 S.W.2d 451 (Tex.Ct.Crim.App.1991) (holding that prior inconsistent statement of a witness which was admitted due to lack of objection by defense counsel was, by itself, sufficient evidence to convict).

41. *See People v. Morrow,* 303 Ill.App.3d 671, 236 Ill.Dec. 844, 708 N.E.2d 430, 436 (1999).

42. *See Chavies, supra.*

43. *See Hendrix, supra.*

44. *See Mancine, supra.*

45. The highest court in New Jersey has also required that "[s]pecial precautionary instructions should be given to the jury to emphasize the unusual care that must be taken before convicting a defendant of a particular offense based solely on a recanted out-of-court prior inconsistent statement." *Mancine,* 590 A.2d at 1119.

46. *See Robar, supra.*

47. *See Connecticut v. Newsome,* 238 Conn. 588, 682 A.2d 972 (1996).

154

to sustain a criminal conviction.[4849]

Considering the above summary, we find the majority view of our sister states is to treat the prior inconsistent statements of witnesses—who have testified at trial and were subject to cross-examination so that the finder-of-fact could hear the witnesses' explanations for making the out-of-court statements, and for their trial recantation—as sufficient evidence upon which a criminal conviction may properly rest if the finder-of-fact could, under the evidentiary circumstances of the case, reasonably credit those statements over the witness's in-court recantations. Accordingly, we are not persuaded that the prevailing weight of authority supports the adoption of the type of *per se* rule advocated by Appellant.

Appellant and Amicus also argue that prior inconsistent statements are inherently unreliable because the fact-finder

48. Contrary to the Commonwealth's contention, New Jersey and Vermont do not deem an inconsistent statement to be sufficiently reliable to sustain a conviction merely because it meets those jurisdictions' relevant evidentiary standards for admission at trial. *See Mancine,* 590 A.2d at 1116–1117 (rejecting contention that once a prior inconsistent statement meets the requirements for admissibility, it alone may be sufficient evidence to support a criminal conviction, and, instead, requiring "substantial evidence ... corroborating any of its specific elements and enhancing its seeming reliability"); *Robar,* 601 A.2d at 1378 (finding that witness's inquest testimony was properly admitted, but stressing that "[f]or purposes of this case, it is ... important to distinguish between admissibility and sufficiency. Evidence that is admissible as bearing on a fact in issue, including the guilt of the defendant, may be insufficient standing alone to convict.")

49. Arizona's highest court allows prior inconsistent statements to be used as substantive evidence in a criminal trial, and, thus, regards them as sufficient to sustain a conviction, unless the admission of the statements would create a danger of unfair prejudice to the defendant. *Compare State v. Allred,* 134 Ariz. 274, 655 P.2d 1326 (1982) (refusing to allow prior inconsistent statement of a child sexual abuse victim to be used as substantive evidence against defendant since statement was that of a very young child, and the fact of its making was not corroborated, thereby making it of low reliability and creating a great danger of unfair prejudice and unjust conviction), *with State v. Moran,* 151 Ariz. 378, 728 P.2d 248 (1985) *adopting in part State v. Moran,* 151 Ariz. 373, 728 P.2d 243, 245–246 (App.1985) (affirming conviction based on recanted statements of a child abuse victim since victim was sixteen years old, the statements were made over a long period of time, the victim did not deny making the statements, and they were corroborated by other evidence).

cannot see the witnesses' demeanor at the time they gave their prior statements and, thus, cannot accurately compare the credibility of the witnesses at that time with their credibility while testifying at trial. We note these arguments are premised on one of the rationales used to justify the now largely disfavored "orthodox rule," [50] which, as discussed, wholly prohibited the use of prior inconsistent statements as substantive evidence at trial for any reason. *See Green,* 399 U.S. at 154, 90 S.Ct. 1930 (listing as one of the three principal justifications for the rule that the "jury cannot observe the declarant's demeanor at the time he made the statement."); *supra* note 19. Our Court has, however, previously recognized and explicitly addressed this concern in *Brady, supra,* where we said:

> The availability of cross-examination at trial ... assures a meaningful opportunity for the trier of fact to observe the declarant who has been called upon and sworn as a witness and questioned as to the discrepancy between the prior statement and the direct testimony. The trier of fact may bring to bear his or her sensory observations, experience, common sense and logic upon the witness to assess credibility and to determine the truth and accuracy of both the out-of-court declarations and the in-court testimony. In one of the earlier opinions rejecting the orthodox position, Judge Learned Hand made this classic statement: "If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court." *DiCarlo v. United States,* 6 F.2d 364, 368 (2d Cir.1925).

*Brady,* 510 Pa. at 129–130, 507 A.2d at 69.

Our Court has, thus, fully embraced the view that it is the finder-of-fact's ability to make in-person observations of the

---

**50.** Our research reveals that only five jurisdictions continue to follow the "orthodox rule": Louisiana, *State v. Smith,* 793 So.2d 1199, 1207 (La.2001); New York, McKinney's CPL § 60.35: North Carolina, *State v. Phillips* 365 N.C. 103, 711 S.E.2d 122, 143 (2011); Tennessee, *State v. Kiser,* 284 S.W.3d 227, 266 (Tenn.2009); and Virginia, Va.Code Ann. § 801–403.

witness at the time of trial, as he or she explains the reasons for the prior statement, which is most crucial to its assessment of the witness's credibility. We have determined that it is the "great engine of cross examination" [51] which furnishes the best method by which the witness's motives for changing his or her story, from that given previously, may be fully and thoroughly explored, and, correspondingly, it is the best means to furnish the finder-of-fact with a sound basis by which it may discern which of the two tales told by the witness is worthy of belief. Professor Charles McCormick aptly described the rationale underpinning the placing of such trust in the process of in-court cross examination to evaluate the respective reliability of the witness's prior inconsistent statements and in-court pronouncements, when he observed:

> [T]he witness who has told one story aforetime and another today has opened the gates to all the vistas of truth which the common law practice of cross-examination and re-examination was invented to explore. It will go hard, but the two questioners will lay bare the sources of the change of face, in forgetfulness, carelessness, pity, terror or greed, and thus reveal which is the true story and which the false. It is hard to escape the view that evidence of a previous inconsistent statement, when the declarant is on the stand to explain it if he can, has in high degree the safeguards of examined testimony.

C. McCormick, *The Turncoat Witness: Previous Statements as Substantive Evidence*, 25 Tex. L.Rev. 573, 577 (1947). This view has gained widespread adherence over the six decades since Professor McCormick first articulated it. *See* 2 McCormick On Evidence § 251 (6th ed.2009) (noting disavowal by other leading evidentiary commentators, such as Professor Wigmore, of the "orthodox rule" and a "substantial movement to abandon the orthodox view completely").

Professor McCormick has articulated another compelling justification for not permitting the "orthodox rule" to bar the finder-of-fact's consideration of a witness's prior inconsistent

51. *Johnson v. Peoples Cab Co.*, 386 Pa. 513, 515, 126 A.2d 720, 721 (1956).

statement—namely, that it would prevent the finder-of-fact from hearing of any potential duress brought to bear on the witness to change his or her account of the events from the time of the statement to the time of trial. As Professor McCormick has noted, when a witness testifies in a manner inconsistent with his or her prior statements, the witness's "story has yielded to something between the giving of the statement and the time of testifying; and the circumstances most frequently suggest that the 'something' which caused the change was an improper influence." 2 McCormick on Evidence § 251. We agree with Professor McCormick that a finder-of-fact should be permitted to hear of any such improper influence which a recanting witness may have been subjected to, as it is integral to the finder-of-fact's credibility determinations. Once again, observation of the witness at the time he or she made the original statement is not necessary for the finder-of-fact to make this assessment at trial, but, rather, allowing the parties to utilize the "great engine of cross examination" is a suitably efficacious means by which any such influences may be unearthed, and their potential impact on the witness's alteration of his or her story suitably considered by the finder-of-fact.

Our Court's decision in *Brady*, which reflects Professor McCormick's reasoned view of the evidentiary value of prior inconsistent statements, acknowledges the practical reality that, for the trial process to function in the manner it was intended, i.e., as a vehicle for the discovery of truth, prior inconsistent statements of a testifying witness bearing on the matter in controversy are valid probative evidence that the finder-of-fact should not only be permitted to hear, but, also, vitally necessary for it to consider if it is to render a sound ultimate decision. *See Brady*, 510 Pa. at 131, 507 A.2d at 70 ("[T]he orthodox position 'serves only to keep relevant and reliable evidence from the jury.... [T]rial is, fundamentally, a search for an objective account of the events upon which the criminal charges are based. An evidentiary rule which forces the searcher to ignore relevant clues whose reliability can be tested by cross-examination serves no purpose.'" (citations

omitted)). Nothing in our Court's own experience since approving the use of prior inconsistent statements as substantive evidence in *Brady* has undermined our estimation of the validity of this assessment and, thus, we reject Appellant's assertion that, simply because the jury did not have the opportunity to observe a witness at the time he or she gave an out-of-court statement, this factor, by itself, renders the out-of-court statement so inherently unreliable that it cannot be sufficient substantive evidence to reasonably support a jury's finding of guilt.

We also reject Appellant's argument that, whenever the Commonwealth is forced to rely on out-of-court statements later recanted by its witnesses as its only evidence of guilt, the burden of proof at trial has impermissibly shifted to the defendant. Such recantations in no way aid the Commonwealth in carrying its burden of proving a defendant's guilt beyond a reasonable doubt, because, undeniably, the recantations furnish proof of the contrary proposition. Further, once its witnesses have recanted while on the stand, the Commonwealth, in order to carry its burden of proof, is forced into the position of having to convince the finder-of-fact that its own witnesses were, at once, unreliable and unbelievable when testifying in court, but wholly reliable and believable when they gave their prior statements. The defendant is, of course, free to further attempt to cast doubt on the Commonwealth's case by cross examining the witnesses to suggest to the finder-of-fact that the substance of the in-court recantation is most credible, but the defendant is not required to prove anything at all in response to the recantations. The burden of proving a defendant's guilt beyond a reasonable doubt remains with the Commonwealth in such situations.

■■■ In sum, then, our review of authority from the United States Supreme Court and our Court, as well as our consideration of jurisprudence from other states which reject a *per se* rule, coupled with our over quarter-century of experience with the use of prior inconsistent statements as substantive evidence by the courts of this Commonwealth, convinces us that criminal convictions which rest only on prior inconsis-

tent statements of witnesses who testify at trial do not constitute a deprivation of a defendant's right to due process of law, as long as the prior inconsistent statements, taken as a whole, establish every element of the offense charged beyond a reasonable doubt, and the finder-of-fact could reasonably have relied upon them in arriving at its decision. Prior inconsistent statements, which meet the requirements for admissibility under Pennsylvania law,[52] must, therefore, be considered by a reviewing court in the same manner as any other type of validly admitted evidence when determining if sufficient evidence exists to sustain a criminal conviction.

■ Consequently, since the out-of-court statements of Garvin, Lawrence and Lanier to the police were reduced to writing, and each of these individuals, by their own admission, signed every page of their statements and, also, the attestation statements at the end which declared that the information in the statements was accurate, all three statements were properly admitted as substantive evidence under Pa.R.E. 803.1(1). Garvin, Lawrence and Lanier were thoroughly tested through cross examination at Appellant's trial, so that the jury had the opportunity to observe these witnesses as they repudiated their out-of-court statements, and to assess the credibility of their explanations for the repudiations. Further, the three out-of-court statements were fundamentally consistent with one another in recounting the same narrative of the manner in which the shooting transpired and in describing similar essential details; thus, they were not so patently unreliable so as to render a jury verdict based upon them one of pure conjecture. Under these circumstances, the out-of-court statements of Garvin, Lawrence and Lanier furnished legally sufficient evidence to sustain Appellant's convictions, and, hence, his convictions did not violate due process.

52. These requirements are that the witness who gave the prior inconsistent statement testify at trial and be subject to cross-examination regarding the statement, and, also, that the witness's previous inconsistent statement was "given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition, or (b) is a writing signed and adopted by the declarant, or (c) is a verbatim contemporaneous recording of an oral statement." Pa.R.E. 803.1(1).

### III. *Testimony of Walker*

### A. *Appellant's Argument*

We next consider the second question on which we granted allowance of appeal: whether Jasaan Walker's written and videotaped confessions constituted "statements against interest" which were admissible under Pa.R.E. 804(b)(3).[53] In Walker's confessions, which he attested to the police he was making voluntarily, Walker expressly admitted that he, along with his two half-brothers, Andre "Cub" Walker and Jack "Fuss" Jarman,[54] shot and killed Lacey and Williams, and shot and injured McCoy. Walker explained that he, Cub, and Fuss were involved in a thriving drug ring, headed by Fuss, which sold approximately 10 grams of crack cocaine—bringing in $15,000 daily—and which operated primarily in the area of the 2200 to 2300 block of Cleveland Street. Walker's confessions demonstrated that he viewed the entire objective of his life as making money from selling drugs as part of this operation.

Walker described the genesis of this shooting as the outgrowth of friction which developed between Fuss and Williams over Williams' alleged interference with the drug operation, as Williams was supposedly skimming profits from sales he had made and robbing other dealers of proceeds from drug sales. Consequently, Fuss came to view Williams as a threat to the viability of the operation and hatched a plan to exact revenge on Williams, which resulted in a pact among Walker, Fuss, and Cub to kill Williams. Although he characterized himself as a reluctant participant in Fuss's plan, Walker nevertheless acquiesced to Fuss's request to meet him on the evening of December 4, 2000 at a home located at the corner of Cumberland Avenue and 18th Street in order to carry out the murder of Williams.

According to Walker, when he arrived at the house, Fuss told him Williams was on the corner and that he wanted to kill him. Walker, Fuss, and Cub departed together to carry out

**53.** *See supra* note 8.

**54.** Cub was Walker's biological mother's son, and Fuss was Walker's biological father's son.

this objective. Walker carried a .44 magnum revolver, Cub had a .38 caliber revolver, and Fuss had a "Glock" 9 millimeter. Walker detailed how the three men circled around and walked up Cleveland Avenue to the corner on which Williams was standing. As they approached the corner, the three put their hoods up on their jackets, donned masks, and entered the alley behind the Minimarket.

Walker recalled that Fuss and Cub came out of the alley onto York Street, while he ran back out onto Cleveland and then turned onto York Street. All three began shooting at that point. Fuss emptied his entire clip of ammunition, firing 6 to 8 shots.

Walker stated that he aimed his gun at Williams, from a distance of 3–4 feet, and shot three times, hitting him once in the upper arm and twice in the torso. Walker noted that the bullets hit Williams in the upper torso which caused his body to jump from the force of the impact and, also, caused Williams to drop a gun he was holding. Videotaped Confession of Jasaan Walker, 5/5/01, beginning at 5 minutes, 57 seconds. Walker, Fuss, and Cub then hastily fled the scene, running to 18th Avenue and stopping between Cumberland and York Streets, where they were picked up by a vehicle driven by another member of the drug operation, Ezra Howard. Howard dropped off the three men at Walker's mother's house, where they took the guns apart. Later that evening, they went to a pier on Philadelphia's waterfront and threw the guns in the river.

At the time he gave his written confession, Walker was asked by the detective who took the statement: "Was [Appellant] Duane [sic] Brown present for the murders?" Jasaan Walker Investigation Interview Record, 5/5/01, at 6. Walker answered, "No. It was me, Andre ["Cub"] and Fuss." *Id.* During the follow-up videotaped interview, one of the detectives told Walker, "There's other witnesses in this case that are identifying a guy by the name of Brown—Dwayne Brown;" Walker stated that Brown had "nothing to do with that shooting" and was "not there." Videotaped Confession of Jasaan Walker, 5/5/01, beginning at 15 minutes, 37 seconds.

In response to further questioning during the same interview, Walker denied any friendship or close relationship with Appellant. Walker acknowledged that Appellant was also a part of the drug operation with which he was affiliated, but that Appellant worked directly for Fuss and Cub arranging drug sales and ensuring payments were made.

In both his written and videotaped confession, Walker additionally identified homes of various relatives and associates in which guns and drugs, as well as substantial amounts of cash, the proceeds of past drug sales, were stored. Walker further noted that Fuss had stashed a quarter of a million dollars in cash in the basement of Fuss's mother's house, and that Cub had confided to him at the time of their arrest that he had $40,000 worth of drugs in his car. During his videotaped confession, Walker also expressed regret over the death of Lacey who was his personal barber, asserting that he was never an intended target, and also indicated that McCoy was an innocent bystander as well. Walker denied that any threats or promises had been made in order to induce him to make these confessions. However, Walker indicated he was threatened by Cub that he would be killed if he cooperated with the police in their investigation.

Appellant's argument with respect to the admissibility of Walker's confessions is straightforward.[55] He asserts that the

55. Appellant additionally has raised arguments in his brief contending the trial court's decision to preclude the admission of Walker's confessions and also the terms of the plea agreement the Commonwealth reached with Walker, which stated Walker would not testify at Appellant's trial, constituted due process violations since both actions interfered with Appellant's constitutional right to present a defense at trial. In his thoughtful concurrence, Justice Saylor has cogently highlighted the troubling aspects of the factual record recited at greater length, *infra*, which he deems to raise significant due process concerns. In sum, this evidence suggests that the Commonwealth prevented the jury from hearing from a witness who gave a statement to the police implicating himself and two other individuals in the shooting, and who also furnished details consistent with the ballistics evidence recovered from the scene, but inconsistent with the Commonwealth's theory of the case that there were only two shooters, while, at the same time, the Commonwealth secured an express agreement from the witness that guaranteed he would be placed outside of the ability of Appellant to cross examine him at trial. Indeed, our high Court has previously held

trial court should have allowed the entirety of Walker's confessions to be introduced into evidence at Appellant's trial as statements against interest under Pa.R.E. 804(b)(3), as they met this rule's two conditions for admissibility: (1) the statement subjected the declarant to criminal liability, and (2) at the time of the statements making there were corroborating circumstances which "clearly indicate the trustworthiness of the statement." Appellant's Brief at 56–57 (quoting Pa.R.E. 804(b)(3)).

Appellant describes the content of Walker's confessions as "unabashedly self-incriminatory." Appellant's Brief at 57. He argues that the character of the confessions indicates they were not designed to deflect blame from himself, but rather they seemed more of an effort on Walker's part to achieve some sort of emotional catharsis by "getting it off his chest." *Id.* Appellant points out that with each of his words, Walker was confessing to the police "criminal activity of the gravest sort," which included: participating in an ongoing drug conspiracy with his two half-brothers to sell drugs, a conspiracy to commit murder, his actual commission of murder, and the killing of an innocent bystander. *Id.* Appellant asserts that these confessions were not in the nature of idle boasts made to a friend for the purposes of impressing; rather, these were "informed, remorseful confessions made directly to homicide detectives," after he was administered his *Miranda* warnings. *Id.* at 58.

Appellant avers that, as Judge Klein concluded in his dissent, Walker's entire confession constituted a declaration

in *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), that exclusion of witness testimony which is critical to the defense, coupled with the state's refusal to allow the defendant to cross-examine the witness at trial, constituted a denial of due process. However, inasmuch as our grant of allocatur did not encompass these particular constitutional questions, as we granted allocatur only to consider the narrow legal question of whether the lower courts erred by excluding the entirety of Jasaan Walker's out-of-court statements under Pa.R.E. 804(b)(3), due to the fact he exculpated Appellant in them, we will not presently address these claims and express no opinion on them at this time. *Commonwealth v. Hacker*, 609 Pa. 108, 112 n. 6, 15 A.3d. 333, 336 n. 6 (2011); *In re T.J.*, 559 Pa. 118, 127 n. 6, 739 A.2d 478, 483 n. 6 (1999).

against penal interest since, even those parts of the confession in which he implicated his half-brothers as co-conspirators, also subjected him to criminal liability, because they revealed a common agreement to kill Williams, and described their actions taken in concert, thereby establishing Walker's liability for their joint conduct, which, by virtue of the conspiracy, also included liability for the murder of Lacey by his co-conspirators. Appellant asserts that, had Walker proceeded to trial, these confessions would undoubtedly have been admissible to prove Walker's guilt of the offense of conspiracy. Thus, he contends, "Walker's confessions, in their entirety, were plainly statements against [Walker's] interest." *Id.* at 59.

Appellant additionally argues that there are three corroborating circumstances which "overwhelmingly indicate the trustworthiness of Walker's confessions." *Id.* The first is the way in which the confessions were taken—namely, that they were given after *Miranda* warnings were administered and after Walker gave his written consent acknowledging receipt of the warnings. Appellant observes that, even after receiving these warnings and giving this consent, Walker further amplified, in his videotaped confession, the admissions he had made in his written confession. Appellant claims that, because Walker was aware of his rights, and because he made his confessions to law enforcement officers, they acquired an increased level of reliability.

Appellant also points out that this is not a situation where "an 'alleged statement' made to a potentially unreliable 'friend' by an equally unreliable alternative suspect, who then denies saying anything of the sort." *Id.* at 60. By contrast, Walker's confession was videotaped, and thus recorded, verbatim, everything Walker said. This enabled the factfinder to actually observe Walker's "real time demeanor" as he was actually confessing. *Id.* This, according to Appellant, makes the confession uniquely trustworthy.

Lastly, Appellant claims the confessions themselves contain "internal indicia of reliability." Specifically, Appellant notes that the confessions described two key facts: (1) the motive for the shooting—to protect Walker's half-brothers' drug prof-

its from running the crack cocaine distribution ring—details of this criminal enterprise he also provided in the confessions; and (2) a precise description of the caliber of the weapons he and his co-conspirators used, which matched the ballistics evidence the police recovered from the scene. Appellant contends these facts establish that Walker's confessions met the requirements for admissibility under Pa.R.E. 804(b)(3).[56]

## B. *Commonwealth's Argument*

In response, the Commonwealth argues that the hearsay rule exception in Pa.R.E. 804(b)(3) is premised on the concept that, while hearsay is generally deemed untrustworthy, some

56. Amicus Defender Association of Philadelphia avers that, under Pa. R.E. 804(b)(3), the portions of Walker's confessions in which he admits to shooting the victims along with his two half-brothers "surely" qualify as an admission against interest as they tended to subject him to criminal liability, and that a reasonable person in Walker's position would not have made the confession unless he believed it was true. Amicus Brief at 26. Amicus points out these confessions resulted in subjecting Walker to drug, conspiracy, and homicide charges. However, Amicus suggests that it is not only such plainly inculpatory statements which fall within the ambit of rules of this nature, but, rather, these rules can be construed to allow the admission of statements which, while not directly inculpatory, nevertheless give the police "significant details about the crime," *id.* at 29 (quoting *Williamson v. United States*, 512 U.S. 594, 603, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) (discussed at greater length *infra*)), or which "bolster the incriminatory effect of the declarant's exposure to criminal liability." *Id.* at 31 (quoting *State v. White*, 158 N.J. 230, 729 A.2d 31, 39 (1999)). Amicus propounds that, because Walker's statements that he and his half-brothers shot the victims satisfies the requirements of Rule 804(b)(3) because they subject him to criminal liability, we need not consider the question of whether collateral but non-inculpatory statements are admissible as well under this rule. However, Amicus notes that at least one jurisdiction, Iowa, has held that collateral material which is "necessary to provide context to the [inculpatory] statements" is admissible under its equivalent exception to the hearsay rule. *Id.* at 32 n. 8 (quoting *State v. Paredes*, 773 N.W.2d 844 (Iowa 1999), withdrawn and replaced by *State v. Paredes*, 775 N.W.2d 554, 565 (Iowa 1999)). With respect to the corroboration requirements of Pa.R.E. 804(b)(3), Amicus asserts these ought not to be construed in a manner so stringent that they interfere with a defendant's ability to present relevant evidence to the jury, and the corroborating factors need not prove the statement is true, but, rather, must simply be sufficiently trustworthy for admission into evidence, with the jury making the ultimate determination as to whether they should be believed or disbelieved.

hearsay statements have "sufficient indicia of reliability" which render them sufficiently trustworthy to be admitted, and a statement against interest is just such a statement. The Commonwealth asserts that what makes a statement admissible under this exception, is only the declarant's "self-inculpation" since it is what subjects the declarant to criminal liability. Commonwealth's Brief at 42. The Commonwealth contends that non-self-inculpatory parts of a confession are not admissible under this exception because they do not subject the maker to criminal liability. The Commonwealth characterizes the portions of Walker's confessions in which he implicated his half-brothers in the shooting as "collateral," as they were not self-inculpatory.

According to the Commonwealth, it "cost Walker nothing to implicate" his half-brothers and Walker's real motive in implicating them was to help himself to get out of the drug trade, as was his desire. Commonwealth's Brief at 42. The Commonwealth also suggests Walker may have named his half-brothers out of a desire for revenge since he was arrested for capital murder, while they remained free; hence, this may be why Walker was so explicit in detailing their drug dealing activities. The Commonwealth also proposes that Walker was trying to minimize his culpability with his confessions by trying to portray himself as merely a pawn who was dominated by his half-brothers in the conduct of the drug trade.

Furthermore, the Commonwealth asserts there is nothing which corroborates Walker's statement that his half-brothers were the shooters, or even that they were present at the shooting, since the eyewitnesses in their written statements stated that Appellant and Walker were present at the scene and were the shooters. The Commonwealth argues that, because of this lack of corroborating evidence, the confessions are not admissible under Pa.R.E. 804(b)(3) for this additional reason. The Commonwealth assigns little value to Walker's correct description of the weapons used by the shooters, characterizing it as not "particularly remarkable" that a killer would know this type of information. *Id.* at 44. The Commonwealth also discounts Walker's admission of his own in-

volvement in the drug dealing network with his half-brothers, as well as his admission to the crime of conspiracy because, from the Commonwealth's perspective, Walker's naming of his half-brothers did not personally inculpate Walker, and, thus, was merely "gratuitous." Commonwealth's Brief at 46. The Commonwealth contends that "only [Walker's] acknowledgment of his own complicity was against his penal interest." *Id.*

The Commonwealth further maintains that the portion of Walker's confession in which he exculpated Appellant was not admissible as a statement against Walker's penal interest due to the fact that confessions exculpating an accomplice have always been deemed inherently unreliable, and our Court has not allowed such confessions to be admitted as statements against interest, citing *inter alia,* our Court's decisions in *Commonwealth v. Brinkley,* 505 Pa. 442, 453–454, 480 A.2d 980, 986 (1984) (holding that "those portions of a statement made by an out-of-court declarant which are not inculpatory, such as statements that another person was not guilty of the crime, are not 'declarations against penal interest' and are not admissible under that hearsay rule exception"), and our Court's plurality decision in *(Eldimiro) Colon, supra.* The Commonwealth reasons that once the declarant confesses his or her own role, there is no additional risk in implicating others. The Commonwealth concludes that the trial court ruling barring the admission of this evidence was, therefore, not erroneous.

## C. *Analysis*

■ Resolution of Appellant's claim involves the proper interpretation of rules adopted by our Court governing the admission of evidence at trial, and, thus, the question is a legal one, which means our standard of review is *de novo,* and our scope of review is plenary. *Touloumes v. E.S.C.,* 587 Pa. 287, 292 n. 4, 899 A.2d 343, 346 n. 4 (2006). Additionally, our Court, in interpreting the meaning of the Pennsylvania Rules of Evidence, ascribes to the words of those rules their plain

and ordinary meaning.  *Commonwealth v. Baumhammers*, 599 Pa. 1, 50, 960 A.2d 59, 89 (2008).

We begin by examining the text of Rule 804(b)(3), which provides:

**(b) Hearsay Exceptions.**  The following statements, as hereinafter defined, are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\*      \*      \*

**(3) Statements against interest.**  A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.  In a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Pa.R.E. 804(b)(3).

In the relevant language of Pa.R.E. 804(b)(3) implicated in this appeal, we discern four criteria which must be met:  (1) the declarant made a statement;  (2) the declarant was, at the time of trial, unavailable as a witness;  (3) the statement "at the time of its making ... so far tended to subject the declarant to ... criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true;" and, as this is a criminal matter (4) "corroborating circumstances clearly indicate the trustworthiness of the statement."  Pa.R.E. 804(b)(3).  The first, second, and fourth criteria are not in dispute in this case, and thus do not require an extended analysis.

With respect to the first criteria, there is no question that both Walker's written and videotaped confessions constitute "statements" within the meaning of this rule.  *See* Pa.R.E.

801(a) ("A 'statement' is (1) an oral or written assertion").[57] Regarding the second criteria, the parties do not dispute that Walker was, at the time of trial, unavailable as a witness as he, under oath, indicated that if called to testify at Appellant's trial, he would invoke his Fifth Amendment privilege against self-incrimination.[58] *See Commonwealth v. Bazemore*, 531 Pa. 582, 585, 614 A.2d 684, 685 (1992) ("A witness who invokes his or her Fifth Amendment privilege is deemed "unavailable" for the purpose of testifying provided the court first determines that the witness' concern with self-incrimination is legitimate."). Moreover, and in any event, the terms of Walker's written plea agreement, also recounted in his oral plea colloquy, in which he agreed not to testify at Appellant's trial, likewise rendered him unavailable to testify.

With regard to the fourth criteria, we find that there existed sufficient corroborating circumstances to "clearly indicate the trustworthiness" of Walker's confessions. Pa.R.E. 804(b)(3). We note specifically that Walker gave his confessions after *Miranda* warnings were administered by the police, apprising him of the consequences that would flow from his confessions, namely, that they would be used in a court of law against him. Nevertheless, Walker freely and openly admitted to his commission of the aforementioned criminal acts, describing in intricate detail: the creation of a pact with two other individuals to kill Williams; their planning of the killing; the implementation of those plans by the execution of a coordinated ambush on Williams and his companions; and the steps they took, together, to conceal their involvement after the shootings. Notably, Walker gave a graphic description of his own slaying of Williams, describing how Williams' body jumped from the force of impact from the bullets he fired. Walker expressly acknowledged that he was not promised anything for his confessions by the police, and further offered that he had been threatened with death by one of the

57. As we discuss *infra*, however, the parties have divergent views on the breadth of the term "statement."

58. The parties do not presently contest the viability of Walker's invocation of the privilege given his prior guilty plea and sentence.

individuals if he cooperated with the police. Thus, Walker had a strong incentive not to implicate those two individuals to the police, and the fact that he did so imparted greater reliability to his confessions.

Also, Walker gave a nearly identical account of his criminal actions, both in his written confession and, significantly, in the confession which was videotaped by the investigating detectives. As Appellant notes, this was not a situation where a self inculpatory statement was given in a remote setting where there were no witnesses, and the recipient of the statement was a person of questionable character. Instead, these confessions were given in a police station to detectives who scrupulously recorded every word in writing and with a video camera exactly as Walker said them. Hence, Walker's confessions were given under conditions which gave maximum assurance that their contents were an accurate reflection of what he said.

Moreover, in making these confessions, Walker did not try to shift the responsibility for his actions from himself to anyone else. While he also implicated his half-brothers, he did so only in the context of explaining his own involvement with them in the commission of the crimes. Although he indicated that he felt some reluctance at one point in participating with his half-brothers in the commission of the crimes, he, nevertheless, admitted to willingly doing so and never suggested that they coerced, threatened or otherwise forced him to do so. Also, Walker's primary purpose in giving his confessions did not seem to be a desire to exonerate Appellant, as he did not, in those confessions, bring up Appellant's non-involvement—except in response to inquiries from the investigating detectives.

Additionally, and importantly, Walker's confessions included critical details which comported with the physical evidence recovered from the crime scene and from the victims' bodies and clothing. In his confessions, Walker described the gun he was carrying as a .44 magnum revolver, and also stated that Cub had a .38 caliber revolver, while Fuss had a "Glock" 9 millimeter. These were the precise caliber and type of the

**three** guns which the Commonwealth's ballistics expert opined were used in the shooting. Further, Walker related that when he shot Williams, Williams dropped a handgun he was holding, and when officers arrived on the scene they discovered an unfired handgun lying underneath Williams' body. These factors strongly corroborate the reliability of the details of Walker's confessions.

The primary crux of the parties' dispute, as reflected by their arguments, seems to center on the third criteria of the hearsay exception: Which portions of Walker's confessions, at the time he made them to police,[59] "so far tended to subject [him] to ... criminal liability ... that a reasonable person in [his] position would not have made the statement unless believing it to be true." Pa.R.E. 804(b)(3). The Commonwealth recognizes that certain parts of Walker's confessions in which he admitted "his own complicity" were self inculpatory, and, hence, admissible under this rule. Commonwealth Brief at 46. Having reviewed Walker's written and videotaped confessions, we find Walker's admissions that he personally shot Williams three times, and his description of the concerted actions he took with two other individuals to both plan and carry out the shootings, so far tended to subject him to criminal liability for the serious crimes of homicide[60] and conspiracy to commit homicide,[61] that a reasonable person in his position would not have made these statements unless he believed them to be true. *See, e.g., Commonwealth v. Young*, 561 Pa. 34, 748 A.2d 166 (1999) (holding statements of witnesses to police describing their involvement, along with the defendant, in a fraudulent scheme, and in the planning and subsequent cover-up of a murder, were admissible as declarations against penal interest); *Swan v. State*, 820 A.2d 342

59. The rule is quite clear that the only relevant time frame for this inquiry is at "the time of [the statement's] making," Pa.R.E. 804(b)(3); thus, Walker's later repudiation of parts of his confessions at his guilty plea hearing, relied upon by the trial court and Justice Eakin in his Dissenting Opinion as proof that Walker's confession was not trustworthy, are not relevant to this inquiry.

60. 18 Pa.C.S.A. § 2501.

61. 18 Pa.C.S.A. § 903.

(Del.2003) (declarant's admissions to his girlfriend and the police describing his participation with another in the planning and commission of a robbery, and his recounting to another witness of how he shot the victim during the robbery, were admissible as statements against interest under a hearsay exception, substantially similar to Pa.R.E. 804(b)(3)); *U.S. v. Smalls*, 605 F.3d 765, 785 (10th Cir.2010) (declarant's description of his involvement with others in planning the murder of an informant, and his description of the actions he took with others to commit the murder, even though intermixed with other self-exculpatory statements, were "undoubtedly" against declarant's penal interest under F.R.E. 804(b)(3)).

However, here Appellant suggests that **the entirety** of Walker's written and videotaped confessions must be admitted as statements against his interest—a position which, as noted above, the Commonwealth vigorously disputes. These competing views cannot be resolved solely from an examination of the plain meaning of the relevant terms of Pa.R.E. 804(b)(3). As indicated previously, "statement" is defined by Pa.R.E. 801(a) as an "assertion." Assertion, in turn, is defined as "a positive statement or declaration." *Webster's Unabridged Dictionary*, 125 (2d. Ed.1998). The term "statement" is ascribed two widely accepted and common meanings, one broad in scope and one narrow. *See id.* at 1861 (defining "statement" alternatively as "a communication or declaration in speech or writing, setting forth facts, particulars etc." or "a single sentence or assertion").

Since the text of Pa.R.E. 804(b)(3) itself does not indicate how expansive the term statement is to be, we must examine other factors. The first and paramount factor to be considered is the foundation on which this rule rests, namely, the belief that it is a fundamental aspect of human nature that people will not make statements that are harmful to their own interests unless they have "substantial reason to believe that the statements are true." 2 McCormick On Evidence § 319; *see also* Bernard S. Jefferson, *Declarations Against Interest: An Exception to the Hearsay Rule*, 58 Harv. L.Rev. 1, 39 (1944) ("One is not likely to concede the existence of facts

which will subject him to criminal liability unless such facts are true."). It is for this reason declarations against penal interest have been deemed sufficiently reliable to be admissible at trial, despite the fact that they are hearsay and the declarant is unavailable for cross examination. Thus, a construction of Pa.R.E. 804(b)(3) which admits only those individual statements in a declaration which subject the maker to criminal liability would seem best suited to effectuate that purpose.

Secondly, as the Commonwealth has indicated, our Court has, in our jurisprudence which predated the adoption of this rule, traditionally regarded only the portion of a confession made by an out-of-court declarant which is inculpatory to be admissible as a declaration against penal interest. *Brinkley, supra; see also Commonwealth v. Anderson,* 501 Pa. 275, 289, 461 A.2d 208, 215 (1983) (endorsing the view of Justice Roberts expressed in his lead opinion in *Colon, supra,* that "it is not the statement that must be against interest, but the *fact stated.*" (emphasis original)). As Pa.R.E. 804(b)(3) "is consistent with prior Pennsylvania decisional law," Pa.R.E. 804(b)(3), Comment, these decisions provide additional support for the conclusion that it is only each individual statement subjecting a declarant to criminal liability, contained within his or her entire communication, which are admissible under this rule. However, these decisions, which concerned the common law declaration against penal interest exception to the hearsay rule, do not, in and of themselves, control the resolution of this question since it is the text of the current rule which is now the governing authority.[62]

**62.** Although the Concurring and Dissenting Opinion is correct that this rule, like many of our Rules of Evidence, is intended to be consistent with the prior common law of the Commonwealth, see Concurring and Dissenting Opinion (Castille, C.J.) at 193–94 n. 3, 52 A.3d at 1191–92 n. 3, it, nevertheless, is the text of the current relevant evidentiary rule which courts of this Commonwealth are tasked with interpreting and applying in determining the admissibility of evidence thereunder. While courts must look to decisions which predate the enactment of a rule as guides in effectuating its proper interpretation whenever it appears that the rule was intended to preserve the substance of the previously existing common law—and we have done so here—those prior decisions by themselves cannot be considered the **final** authority

Thirdly, the comment to Pa.R.E. 804(b)(3) notes that this portion of the rule, at the time of its adoption, precisely tracked the language of its then-extant counterpart, F.R.E. 804(b)(3), which provided:

> **(3) Statement against interest.**—A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

F.R.E. 804(b)(3) (2000).[63, 64] Accordingly, although we are not bound by the decisions of the United States Supreme Court construing the Federal Rules of Evidence when interpreting our own evidentiary rules, since the high Court in *Williamson, supra,* directly confronted this same question, which arose under F.R.E. 804(b)(3), we find its interpretation of the equivalent language in the federal rule to be instructive.

In *Williamson,* the driver of an automobile was arrested and found to be in possession of a substantial quantity of cocaine. When questioned by DEA agents, the driver gave two statements. In the first statement, he recounted that he was given the cocaine by a third person and was driving the car to meet Williamson. However, when the DEA agent indicated he was going to arrange a controlled delivery of the cocaine, the driver recanted his first statement, indicating that he lied, and he gave the agent a second statement in which he averred that he was transporting the cocaine on behalf of Williamson. Williamson was subsequently arrested on various cocaine trafficking offenses; however, at his trial, the driver

---

for interpreting the specific textual parameters of the present evidentiary rule as, quite simply, the rule, as currently constituted, did not exist at the time of those decisions. Moreover, as we explain herein, our construction of Pa.R.E. 804(b)(3) is consistent with our prior decisions concerning the admission of declarations against penal interest which predate the adoption of this evidentiary rule.

**63.** This rule has since been amended.

**64.** *See* Pa.R.E. 804(b)(3), Comment ("The first sentence of Pa.R.E. 804(b)(3) is identical to the first sentence of F.R.E. 804(b)(3).").

refused to testify against him. As a result, the government sought introduction of his statements under F.R.E. 804(b)(3), and the District Court ruled them admissible—a ruling the Court of Appeals for the Eleventh Circuit affirmed.

The high Court reversed. Addressing the proper construction of "the scope of the hearsay exception for statements against penal interest," the Court acknowledged that "statement" under F.R.E. 801(a)(1) [65] could be construed to mean either "a single declaration or remark" or "an extended declaration." *Williamson*, 512 U.S. at 599, 114 S.Ct. 2431. The high Court considered that the narrower construction of the Rule more closely comported with the principle undergirding the Rule, stating:

> Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true. This notion simply does not extend to the broader definition of "statement." The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature.

*    *    *

> The fact that a statement is self-inculpatory does make it more reliable; but the fact that a statement is collateral to a self-inculpatory statement says nothing at all about the collateral statement's reliability. We see no reason why collateral statements, even ones that are neutral as to interest ... should be treated any differently from other hearsay statements that are generally excluded.

*Id.* at 599–600, 114 S.Ct. 2431.

The high Court concluded that F.R.E. 804(b)(3) "does not allow admission of non-self inculpatory statements, even if

---

**65.** Like Pa.R.E. 801(a)(1), F.R.E. 801(a)(1) defines statement as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion."

they are made within a broader narrative that is generally self-inculpatory." *Id.* at 600–601, 114 S.Ct. 2431. The high Court stressed that it cannot be assumed that a statement is automatically self-inculpatory because it is contained within a full confession. Consequently, the high Court directed that an examination of the individual statements contained within the confession was required to determine if each were self-inculpatory and, hence, admissible under F.R.E. 804(b)(3).

However, the Court specified that examination of each of the statements was not to be done in isolation. Instead, the Court emphasized:

> [W]hether a statement is self-inculpatory or not can only be determined by viewing it in context. Even statements that are on their face neutral may actually be against the declarant's interest. "I hid the gun in Joe's apartment" may not be a confession of a crime; but if it is likely to help the police find the murder weapon, then it is certainly self-inculpatory. "Sam and I went to Joe's house" might be against the declarant's interest if a reasonable person in the declarant's shoes would realize that being linked to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy. And other statements that give the police significant details about the crime may also, depending on the situation, be against the declarant's interest The question under Rule 804(b)(3) is always whether the statement was sufficiently against the declarant's penal interest "that a reasonable person in the declarant's position would not have made the statement unless believing it to be true," and this question can only be answered in light of all the surrounding circumstances.

*Id.* at 603–604, 114 S.Ct. 2431 (footnote omitted).

██ We find the *Williamson* analytical approach to be sound, and in accord with both the fundamental purpose underlying our adoption of Pa.R.E. 804(b)(3) and our prior caselaw interpreting the scope of the declaration against penal interest under our common law discussed above, *Brinkley, Anderson supra,* since it permits only the introduction of the portion or portions of an out-of-court statement which are self-

inculpatory to the declarant.[66] Thus, in determining whether a particular declaration is admissible under Pa.R.E. 804(b)(3) because it subjects its maker to criminal liability, each of the statements in the declaration must be examined, in the context in which it was made, as well as in conjunction with all of the circumstances surrounding the criminal activity described by the declaration. If an individual statement, when viewed in this manner, "so far tended to subject the declarant to ... criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true," it is admissible under Pa.R.E. 804(b)(3). If an individual statement does not do so, when examined, it is not admissible under this exception to the hearsay rule.[67]

**66.** A substantial number of state courts have elected to endorse the reasoning of *Williamson* in construing this aspect of their own evidentiary rules governing admissibility of statements against interest, which like our rule, are patterned after F.R.E. 804(b)(3). *See, e.g., State v. Prasertphong,* 206 Ariz. 70, 75 P.3d 675, 686–687 (2003), *vacated and remanded on other grounds,* 541 U.S. 1039, 124 S.Ct. 2165, 158 L.Ed.2d 727 (2004); *Smith v. State,* 647 A.2d 1083, 1088 (Del.1994); *Franqui v. State,* 699 So.2d 1312, 1320 (Fla.1997); *State v. Averett,* 142 Idaho 879, 136 P.3d 350, 361 (App.2006); *State v. Lucky,* 755 So.2d 845, 857 (La.1999); *State v. Matusky,* 343 Md. 467, 682 A.2d 694, 705 (1996); *State v. Ford,* 539 N.W.2d 214, 227 (Minn.1995); *Williams v. State,* 667 So.2d 15, 19 (Miss.1996), *overruled on other grounds, Smith v. State,* 986 So.2d 290 (Miss.2008); *State v. Castle,* 285 Mont. 363, 948 P.2d 688, 693 (1997); *State v. Torres,* 126 N.M. 477, 971 P.2d 1267, 1272 (1998), *overruled in part on other grounds* by *State v. Alvarez–Lopez,* 136 N.M. 309, 98 P.3d 699 (2004); *State v. Holmes,* 342 S.C. 113, 536 S.E.2d 671, 673 (2000); *State v. Dotson,* 254 S.W.3d 378, 392–93 (Tenn.2008); *Dewberry v. State,* 4 S.W.3d 735, 751 (Tex.Ct.Crim.App.1999); *State v. Roberts,* 142 Wash.2d 471, 14 P.3d 713, 727 (2000); *State v. Mason,* 194 W.Va. 221, 460 S.E.2d 36, 45 (1995), *overruled in part on other grounds* by *State v. Mechling,* 219 W.Va. 366, 633 S.E.2d 311 (2006); *Johnson v. State,* 930 P.2d 358, 363 (Wyo.1996).

A minority of jurisdictions have either declined to follow *Williamson* or adopted different interpretations of their parallel evidentiary rules. *See People v. Newton,* 966 P.2d 563, 578–79 (Colo.1998); *State v. Hills,* 264 Kan. 437, 957 P.2d 496, 503 (1998); *State v. Sonthikoummane,* 145 N.H. 316, 769 A.2d 330, 334 (2000); *State v. White,* 158 N.J. 230, 729 A.2d 31, 39 (1999); *State v. Julian,* 129 Ohio App.3d 828, 719 N.E.2d 96, 100 (1998); *Chandler v. Commonwealth,* 249 Va. 270, 455 S.E.2d 219, 225 (1995).

**67.** We note that, contrary to the assertion of the Chief Justice in his Concurring and Dissenting Opinion, *see* Concurring and Dissenting

■ As described above, substantial portions of Walker's written and videotaped confessions involved descriptions of his commission of the crimes of murder and conspiracy to commit murder with two other individuals, hence, we find these statements so far tended to subject him to criminal liability that they meet the standard for admissibility under Pa.R.E. 804(b)(3). However, both the trial court and the Superior Court disregarded this inescapable conclusion in their rulings excluding the totality of Walker's confessions. Instead, both courts deemed all of Walker's confessions inadmissible because of Walker's statements, in response to police questions, that **Appellant** was not involved in the shooting. While these statements exculpating Appellant did not, in context, expose Walker to criminal liability, and, thus, were inadmissible under Pa.R.E. 804(b)(3),[68] it was error for the lower courts to also exclude Walker's statements which were inculpatory and properly admissible under this rule.[69]

Opinion (Castille, C.J.) at 194–95, 52 A.3d at 1194–95, nothing in our present holding, which is merely an interpretation and application of Pa.R.E. 804(b)(3), in any way can be used to alter the strictures set down by the high Court limiting the admission of an out-of-court statement by the Commonwealth **against** a non-testifying criminal defendant on Confrontation Clause grounds. *See, e.g., Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (admission at joint trial of unredacted confession of codefendant which implicates defendant in the crime violates defendant's Sixth Amendment right to confront witnesses against him); *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) (Sixth Amendment bars admission at trial of out-of-court statement which is testimonial in nature unless the declarant is unavailable and the defendant had a prior opportunity to cross examine the defendant). Because our decision today involves a *defendant* tried alone who is seeking to introduce a declaration against penal interest, admission of the out-of-court declaration does not present Confrontation Clause difficulties. *See Lilly v. Virginia*, 527 U.S. 116, 130, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality) ("The second category of statements against penal interest encompasses those offered as exculpatory evidence by a defendant who claims that it was the maker of the statement, rather than he, who committed (or was involved in) the crime in question.... **[B]ecause hearsay statements of this sort are, by definition, offered by the accused, the admission of such statements does not implicate Confrontation Clause concerns.**") (emphasis added).

68. We express no opinion as to the admissibility of these statements under any other rule of evidence.

69. In his Concurring and Dissenting Opinion, the Chief Justice opines that, because Appellant only argued that the entirety of Walker's confes-

In deciding whether this error necessitates the grant of a new trial, we must consider whether the error was harmless under the circumstances. An error is harmless only if the reviewing court concludes beyond a reasonable doubt that it could not have contributed to the verdict. *Commonwealth v. Chmiel*, 585 Pa. 547, 593, 889 A.2d 501, 528 (2005). It is the burden of the Commonwealth to prove, beyond a reasonable doubt, that the error did not contribute to the verdict. *Commonwealth v. Williams*, 607 Pa. 597, 609 n. 7, 9 A.3d 613, 619 n. 7 (2010). If there exists a reasonable possibility the error contributed to the conviction it cannot be deemed harmless. *Commonwealth v. Wright*, 599 Pa. 270, 312, 961 A.2d 119, 143 (2008).

There are three circumstances under which our Court has recognized that an error is harmless: (1) the error was not prejudicial to the defendant, or any prejudice suffered by the defendant was *de minimis*; (2) erroneously admitted evidence was cumulative with respect to other properly admitted evidence; or (3) the prejudicial effect of the error is so insignificant in comparison to the other trial evidence that it is clear beyond a reasonable doubt that the error could not have contributed to the fact-finder's decision. *Commonwealth v. Smith*, 580 Pa. 392, 401–402, 861 A.2d 892, 897 (2004).

sions were admissible as declarations against penal interest, and never argued that specific portions thereof were admissible on this basis, Appellant waived the right to obtain relief with respect to the individual statements that we presently determine to be declarations by Walker against his penal interest. Concurring and Dissenting Opinion (Castille, C.J.) at 190–91, 52 A.3d at 1190–91. We respectfully disagree. As Justice Saylor notes in his Concurring Opinion, Concurring Opinion (Saylor J.) at 183–84, 52 A.3d at 1186, Appellant requested that the trial court admit Walker's confessions in their entirety as declarations against penal interest, and the statements which we presently conclude should have been admitted into evidence by the trial court on that basis comprise a discrete subset of the total number of statements comprising Walker's confessions. Appellant has specifically argued at all times, and in all phases of this litigation, that Walker's statements were admissible as declarations against penal interest because their contents were self-inculpatory, and he renews this theory of relief in the present appeal before our Court. Thus, while not all of the statements in Walker's confessions were self-inculpatory, Appellant is, nevertheless, entitled to relief for the improper exclusion by the trial court of the specific statements of Walker which were self-inculpatory.

The Commonwealth makes no argument in regard to harmless error, nor do we discern how the Commonwealth could carry its burden of demonstrating that the trial court's exclusion of Walker's statements in which he admitted to conspiring with two other individuals to having murdered Williams, and to having personally shot Williams, was harmless beyond a reasonable doubt. This evidence would have been significant to the jury's consideration of the question of Appellant's guilt, as it showed that two other individuals acted in concert with Walker to shoot the victims, not one. Walker's statements thus directly contradicted the Commonwealth's theory of the case that Appellant acted in conjunction with only one other person to shoot the victims, and, also, directly contradicted the out-of-court statements of Garvin, Lanier, and Lawrence, on which the Commonwealth relied as the sole evidence to convict Appellant, since each of those out-of-court statements described the shooting as having been committed by only two people. In light of the fact that the Commonwealth presented no evidence in support of Appellant's guilt other than the out-of-court statements of Garvin, Lawrence and Lanier, which each of these witnesses repudiated on the stand, and, most significantly, that the ballistics evidence suggested three shooters were involved, not two as the out-of-court statements indicated, we cannot regard the trial court's error in excluding Walker's self-inculpatory statements as harmless beyond a reasonable doubt. Consequently, Appellant is entitled to a new trial. On remand, if Jasaan Walker is again unavailable to testify, the trial court may consider, consistent with the guidelines set forth in this opinion, whether any remaining portions of Walker's confessions, in addition to those discussed herein, as well as the identity of the two other shooters whom Walker identified as his half-brothers, are admissible under Pa.R.E. 804(b)(3) or under any other rule of evidence.

## IV.  *Conclusion*

In conclusion, we hold that a conviction which rests solely on the prior inconsistent statements of witnesses who testify at

trial, where such statements were properly admitted, but recanted at trial, does not offend due process provided the makers of such statements have been made available for cross examination, and, based on the content of the statements as a whole, a finder-of-fact could reasonably find that every element of the offense or offenses charged has been proven beyond a reasonable doubt. Secondly we hold that, in determining whether an out-of-court declaration is admissible under Pa.R.E. 804(b)(3) for subjecting its maker to potential criminal liability, a trial court must examine each of the individual statements in the declaration, in the context in which it was made and in context with the other statements and factual circumstances surrounding the criminal activity described in the declaration, and admit only those individual statements which "so far tended to subject the declarant to ... criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Pa.R.E. 804(b)(3). Accordingly, while we approve the lower courts' rulings regarding the sufficiency of the evidence, we conclude that the lower courts erred in excluding those self-inculpatory portions of Walker's confessions discussed above, and that such error was not harmless. Thus, Appellant is entitled to a new trial consistent with the evidentiary guidelines set forth in this opinion.

Judgment of sentence vacated. Case is remanded to the Superior Court to be remanded to the Court of Common Pleas of Philadelphia for a new trial. Jurisdiction relinquished.

Justice ORIE MELVIN did not participate in the decision of this case.

Justice BAER and McCAFFERY join the opinion.

Justice SAYLOR files a concurring opinion.

Chief Justice CASTILLE files a concurring and dissenting opinion.

Justice EAKIN files a concurring and dissenting opinion.

Justice SAYLOR, concurring.

I join Parts I and IV of the majority opinion.

I also join Part II, although in my view, Appellant's brief makes a colorable case for establishing a floor to the critical concept of beyond-a-reasonable doubt where the crucial statements of Commonwealth witnesses are inherently self-contradictory. Moreover, while cross-examination certainly serves as a cornerstone of the American trial process, it is by no means a perfect means of adducing truth. Thus, I regard our rejection of Appellant's position as representing more of a policy choice in light of competing considerations than a foregone conclusion resulting from the absence of any creditable counter-argument.

As for Part III, I support the majority's decision to adopt a narrow construction of Rule 804(b)(3) based substantially on the reasoning expressed by the Supreme Court in *Williamson v. United States,* 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), in its similar interpretation of the rule's federal counterpart, as highlighted by the majority. *See* Majority Opinion, at 174–75, 52 A.3d at 1180–81 (quoting *Williamson,* 512 U.S. at 599–600, 114 S.Ct. at 2435). I also agree with the majority that the portion of Jasaan Walker's confession recounting that the killings were accomplished as part of a three-man conspiracy were self-inculpatory as to the offense of conspiracy. *Accord U.S. v. Cruz,* 797 F.2d 90, 97 (2d Cir.1986). With regard to Rule 804(b)(3)'s specification that declarations against penal interest may only be admitted where corroborating circumstances clearly indicate the statement's trustworthiness, I am in alignment with the majority to the degree it finds this prerequisite satisfied based upon external circumstances, primarily: the fact that the ballistics evidence recovered by the police aligned with Walker's description of the number and types of weapons used in the crime, *accord U.S. ex rel. Gooch v. McVicar,* 953 F.Supp. 1001, 1009 (N.D.Ill. 1997); and that the responding officers' finding of an unfired handgun under Williams's body comported with Walker's recitation that Williams dropped such a weapon when he was shot. *See* Majority Opinion, at 170–71, 52 A.3d at 1178.

I have a different view, however, of some of the internal facets of the confession. Most notably, I would not assign any weight to Walker's assertion that he was threatened with death if he cooperated with the police, or his denial that the police offered him leniency in return for his confession. These do not seem like the type of items that can supply corroboration for Rule 804(b)(3) purposes, as the majority seems to indicate. The statements—which the majority appears to accept as fact, *see* Majority Opinion, at 167–68, 52 A.3d at 1176–77—constitute untested allegations in the declaration itself. I am circumspect about relying on such allegations as "circumstances" tending, on their own, to bolster the reliability of the statement in which they appear. *See generally* Fed.R.Evid. 804(b)(3), Advisory Committee Note ("The requirement of corroboration should be construed in such a manner as to effectuate its purpose of circumventing fabrication.").

Additionally, although I agree with the majority that the exclusion of Walker's entire declaration amounted to error, like Mr. Chief Justice Castille I am not certain that the names of the co-conspirators, in themselves, tended to inculpate Walker. *See* Concurring and Dissenting Opinion, at 195–96, 52 A.3d at 1193–94 (Castille, C.J.). Nevertheless, I do not understand this Court's present holding to encompass a specific requirement that Walker's identification of his half-brothers as his co-conspirators be placed before the jury. In my reading, the majority leaves room for the trial court to redact such names if it finds that they do not tend to inculpate Walker. Even assuming such a redaction occurs, however, I concur with the majority that the trial court's error was not harmless because an alleged three-man conspiracy, together with ballistics evidence indicating that three weapons were used, could have raised a reasonable doubt as to whether the prior statements of Lawrence, Garvin, and Lanier were trustworthy. *See* Majority Opinion, at 178–80, 52 A.3d at 1183–84.

I recognize that the number of participants in the conspiracy itself might also not be regarded as being against Walker's penal interests (so long as one other co-conspirator is recognized). Nevertheless, in the unique circumstances of this

case—that is, where the Commonwealth's main proofs consist of prior inconsistent witness statements offered for substantive effect—I believe Appellant should have been permitted to go so far as to introduce Walker's conflicting statement that there were three participants. I acknowledge Mr. Chief Justice Castille's point that the trial court was not asked to introduce such a limited portion of Walker's statement, *see* Concurring and Dissenting Opinion, at 190–91, 52 A.3d at 1190–91 (Castille, C.J.); however, Appellant did ask the trial court to admit the statement as a whole, of which the conspiracy information is a subset. In this regard, I am not sure that a criminal defendant should be required to present a potentially endless series of fallback positions to preserve a challenge to a trial court's ruling excluding evidence, where such ruling is partially incorrect. *See generally* Majority Opinion, at 178–79 n. 69, 52 A.3d at 1183 n. 69.

I also have substantial concerns regarding Appellant's due process claim centered on the Commonwealth's asserted procurement of Walker's unavailability to testify. In this regard, although the Commonwealth vigorously denies the factual allegation, there is record support for it. *See Commonwealth v. Walker,* Nos. 0106–0562, 0106–0563, Guilty Plea Colloquy, at 52, 63 (C.P.Phila., Jan. 24, 2006) (reciting Walker's testimony that he had made a "deal" with the Commonwealth, and that the agreement included Walker's "promise" not to testify at Appellant's trial).[1] While the record is not definitive on the point, it does suggest that Appellant is correct in asserting that Walker was unavailable because the Commonwealth extracted from him a promise not to testify at Appellant's trial. *See* Brief for Appellant at 51–52. At Walker's guilty plea hearing—which preceded Appellant's trial—the following exchange took place:

> The Court: ... Now, Mr. Walker, we talked about the fact that for the two cases, the two murders and the agg assault, the conspiracy and the PIC, the Commonwealth is going to nol pros all the other charges. That's just Latin for drop

1. The record of Walker's guilty plea colloquy was sealed by the common pleas court. It was unsealed after Appellant's trial concluded and is part of the record before us.

the charges.  And *you have also promised that you will not testify in Dwayne Brown's case.*  Is that true?

[Walker]:  Yes, Your Honor.

N.T., Jan. 24, 2006, at 62–63 (emphasis added).[2]

If Walker had been available to testify at Appellant's trial, and if he had failed to exculpate Appellant, the portion of his videotaped confession in which he expressly exculpates Appellant would have been admissible as substantive evidence, *see* Pa.R.E. 803.1(1) (pertaining to prior inconsistent statements of a witness); *Commonwealth v. Wilson*, 550 Pa. 518, 527, 707 A.2d 1114, 1118 (1998) (holding that, under the standard announced in *Commonwealth v. Lively*, 530 Pa. 464, 610 A.2d 7 (1992), a prior inconsistent statement may be used as substantive evidence when it is an audiotaped or videotaped recording), as the Commonwealth concedes.  *See* Brief for Appellee at 53.  In my view, these aspects raise substantial due process concerns.

Chief Justice CASTILLE, concurring and dissenting.

I concur in the result to the extent that the Majority Opinion rejects the claim that the trial court violated appellant's due process rights by admitting into evidence the out-of-court statements of trial witnesses David Garvin, Lionel Lawrence, and Allen Lanier, subject to the observations I develop in Part I.  For the reasons I explain in Part II, however, I respectfully dissent from the Majority's award of a new trial, which is premised on a finding that Jasaan Walker's out-of-

2.  The Commonwealth asserts that the court's "promise" terminology was mistaken, and argues, as well, that Walker's written plea agreement only includes a "statement" that Walker would not testify in Appellant's case.  The Commonwealth additionally alleges that such statement was included at Walker's behest.  *See* Brief for Appellee at 15 & n. 7, 47–48 n. 27. However, the Commonwealth never objected to the plea court's terminology, and there is no indication as to who requested that the statement be inserted into the written plea agreement.  Moreover, as it would be unreasonable assume that Walker meant that had promised *himself* that he would not testify, the only inference that can reasonably be drawn from the record presently before this Court is that, through a *quid pro quo* arrangement, the Commonwealth extracted a promise from Walker not to testify at Appellant's trial in return for whatever benefit Walker expected to receive from the plea agreement.

court declarations to the police exculpating appellant were erroneously excluded from evidence at trial. To the extent Walker's hearsay statement tended to exculpate appellant, the statement did not inculpate Walker and was inadmissible under the exception to the hearsay rule for declarations against penal interest. The penal interests of Walker and appellant simply are not coterminous. Moreover, while the Court's erroneous ruling today is a boon for this one defendant, the holding will be a bane for future defendants because the Court's reasoning invites the Commonwealth to employ hearsay declarations of co-conspirators to inculpate defendants on trial. Because I would affirm the Superior Court's decision in its entirety, I respectfully dissent from the Majority's mandate to grant appellant a new trial.

## I. Point in Concurrence: Recanted Statements of Available Witnesses

With respect to the first issue on which this Court granted review, appellant nominally challenges the sufficiency of the evidence for conviction, but in actuality he offers a hybrid, bootstrapped argument blending an evidentiary claim with a derivative sufficiency claim. Appellant assails the credibility of inconsistent out-of-court statements generally, and those of eyewitnesses Garvin, Lawrence, and Lanier specifically, asking the Court to reconsider the weight the jury should have given to these testifying witnesses' prior inconsistent statements in determining appellant's guilt. Bootstrapping from the theory that the Garvin, Lawrence, and Lanier out-of-court statements should have no evidentiary value, appellant concludes that the Commonwealth did not adduce sufficient evidence to prove his identity as the perpetrator of the crimes beyond a reasonable doubt.

To a great extent, the Majority takes appellant's blended argument at face value, without recognizing that appellant seeks to change existing law and establish an evidentiary rule that an out-of-court statement signed and adopted by an available witness who testified, recanted, and was cross-examined at trial is *per se* unreliable and, therefore, has no proba-

tive value as a matter of law to establish an element of the crime (here, identity). According to appellant, because such out-of-court statements have no weight, the prosecution did not adduce any evidence to prove that appellant, rather than another person, was guilty beyond a reasonable doubt of these first-degree murders.

Appellant's argument, when properly understood, does not raise a cognizable sufficiency claim at all. It proceeds upon the assumption that appellant's evidentiary/weight theory, if accepted, can serve as a basis to diminish the evidentiary record for purposes of sufficiency review. The theory plainly is mistaken:

It is important to maintain the distinction between sufficiency review and rulings on evidence. When reviewing the sufficiency of the evidence, this Court must determine whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support the verdict. *Lehigh County Vo–Tech Sch. v. Workmen's Compensation Appeal Bd. (Wolfe)*, 539 Pa. 322, 652 A.2d 797, 800 (1995). A sufficiency claim will not be reviewed on a diminished record, "but rather on the evidence actually presented to the finder of fact rendering the questioned verdict." *Commonwealth v. Lovette*, 498 Pa. 665, 450 A.2d 975, 977 (1982); *accord Commonwealth v. Hall*, 574 Pa. 233, 830 A.2d 537, 542 n. 2 (2003). If some of the evidence relied upon to render the verdict was inadmissible, the appropriate remedy is remand for a new hearing without the prohibited evidence. *Commonwealth v. Conklin*, 587 Pa. 140, 897 A.2d 1168, 1175 n. 12 (2006); *see also Lovette*, 450 A.2d at 981. Only a successful sufficiency challenge considering the full record at trial may lead to the outright grant of relief. *Conklin*, 897 A.2d at 1175 n. 12.

*D'Alessandro v. Pa. State Police*, 594 Pa. 500, 937 A.2d 404, 409–10 (2007) (Opinion Announcing Judgment of the Court).

The Commonwealth here was permitted to introduce the prior out-of-court statements of Garvin, Lawrence, and Lanier as substantive proof that appellant was the person who killed

the victims. Under settled law, the three statements were not hearsay because they were signed and adopted by the declarants, who testified at trial and were cross-examined by appellant. Pa.R.E. 803.1(1)(b). The statements were properly admitted into evidence to prove the truth of the matter asserted therein (*i.e.,* that appellant killed the victims), and the jury was instructed accordingly. *Commonwealth v. Brady,* 510 Pa. 123, 507 A.2d 66, 70 (1986); *Commonwealth v. Lively,* 530 Pa. 464, 610 A.2d 7, 10 (1992). The admission of the Garvin, Lawrence, and Lanier statements for substantive purposes comports with the requirements of the Sixth Amendment Confrontation Clause, as applied to the states through the Fourteenth Amendment Due Process Clause. *California v. Green,* 399 U.S. 149, 164, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). Neither the U.S. Supreme Court nor this Court have qualified their holdings to date in *Brady, Lively,* or *Green* by limiting, as a matter of law, the probative value of out-of-court statements on grounds of supposed unreliability, as appellant suggests.

The jury here was free to accept the out-of-court accounts of these witnesses as fact; and those accounts amply proved appellant's identity as the murderer. Even if we were inclined to reconsider our jurisprudence on use of prior inconsistent statements as substantive evidence, that revolution in the law would not provide a basis for sufficiency relief. Instead, a new trial would have to be ordered, at which the Commonwealth could determine how best to forward its case. *Lovette,* 450 A.2d at 981.

Appellant acknowledges the settled holdings of *Green, Brady,* and *Lively,* and denies that he is challenging the admissibility of the out-of-court statements as substantive evidence. Appellant's Brief at 22. But, appellant's disclaimer rings hollow, because he argues that the jury, while free to hear the Garvin, Lawrence, and Lanier statements as substantive proof of the perpetrator's identity, should have been prevented from giving those statements any weight in its consideration of that element of the crime. Such a rule clearly would eviscerate the

availability of the testimony as substantive evidence and, therefore, the holdings of *Green, Brady,* and *Lively.*

Trials are a search for the truth. There are many reasons why a witness says one thing outside of court, and another thing when on the stand. One common reason why witnesses in criminal cases change their accounts at trial is fear of reprisal; indeed, this reality has led this Court to approve reinstitution of grand juries in cases where there is a prospect of witness intimidation. *See* Pa.R.Crim.P. 556 *et seq.* (effective Dec. 18, 2012). Of course, this is not the only reason witnesses change their accounts. The point is that the trial of a matter allows all of the factors particular to the case to be played out in front of the factfinder, whose role it is to assess where the truth lies. So long as the witnesses are subject to cross-examination, as they were here, there is no reason to skew the search for truth with an evidentiary restriction on prior statements inconsistent with trial recantations or denials by a witness. Accordingly, appellant's suggestion that the Garvin, Lawrence, and Lanier statements should have no weight in the jury's determination regarding the identity of the killer is plainly meritless.

In an entwined claim, appellant requests that we reject the jury's credibility determinations as to Garvin, Lawrence, and Lanier, that we reweigh the evidence in his favor, and find that the verdict was the result of surmise and conjecture; or, in actuality, was against the weight of the evidence. *See* Appellant's Brief at 35 (citing *Commonwealth v. Farquharson,* 467 Pa. 50, 354 A.2d 545 (1976) and *Commonwealth v. Karkaria,* 533 Pa. 412, 625 A.2d 1167 (1993)). The trial court did not abuse its discretion in denying relief on this theory. The evidence here did not require the jury to speculate as to guilt. *Farquharson,* 354 A.2d at 550 ("where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding"). *See Commonwealth v. DeJesus,* 580 Pa. 303, 860 A.2d 102, 105–07 (2004) (challenge to verdict pursuant to *Farquharson* is to weight, not sufficiency, of evidence); *Commonwealth v. San-*

*chez,* 36 A.3d 24, 37 (Pa.2011) (same).[1]  Garvin, Lawrence, and Lanier gave direct evidence in their out-of-court statements that appellant was the murderer.  At trial, the three witnesses were subject to extensive cross-examination by appellant, which exposed any so-called improper motives to the jury for the out-of-court statements.  The jury resolved those credibility determinations in favor of the Commonwealth and convicted appellant.  Accordingly, there is no reason to second-guess the trial judge's exercise of discretion, to unsettle the jury's credibility determinations, or to reweigh the evidence in favor of appellant.

Although I ultimately agree with the Majority's conclusion that appellant's theories are meritless, and I join much of its reasoning, I concur in the result only.  In my respectful view, we would provide better guidance if we more plainly delineated the separate issues before the Court.

## II.   Point in Dissent:  Statement of Co-defendant Jasaan Walker

As concerns the second issue on which this Court granted review, however, I respectfully dissent from the Majority's analysis and mandate.

Co-conspirator Jasaan Walker gave two distinct statements to the police on May 5, 2001, one written and one videotaped. Walker and appellant were initially listed for a joint trial but, after a hearing regarding the admission of Walker's written statement, the Commonwealth agreed to sever the two trials and the trial court agreed.  Walker pleaded guilty shortly before his trial was to commence, and the records of his agreement and plea colloquy were sealed because Walker expressed fear for his safety in prison.  Following Walker's

1.  The "surmise or conjecture" language of *Farquharson,* in a sufficiency analysis, obviously was an unfortunate choice of words.  Evidence is sufficient or it is not; evidence satisfying each of the elements is presented or it is not.  When there is evidence as to all elements of the crime, sufficient for the case to go to the factfinder, the question of guilt is for the factfinder, period.  As a matter of logic, it is weight claims, not sufficiency claims, that authorize post-decisional judicial intervention premised upon the strength of otherwise sufficient evidence.

guilty plea, appellant moved to offer into evidence at his own trial Walker's two out-of-court statements. The trial court noted Walker's refusal to testify at appellant's trial—a point appellant did not dispute—and found Walker's statements inadmissible because they were either irrelevant or the relevant exculpatory parts (exculpatory as to appellant) were not against Walker's penal interest and therefore lacked indicia of reliability; *i.e.*, the statements were hearsay that did not fall within an exception. *See* Notes of Testimony ("N.T."), 1/24/2006, at 3–5, 87–88 (Walker Guilty Plea); N.T., 1/31/2006, at 6–8, 10–12; *see also* N.T., 1/23/2006, 46–51. The Superior Court affirmed this straightforward analysis.

The Majority reverses and holds that the trial court erred in excluding Walker's statements in their entirety, because **parts** of the statements were against Walker's penal interest. Inexplicably, though quick to find error committed by the lower court, the Majority does not identify exactly or explain which parts of Walker's statements were against his penal interest, and should have been deemed admissible at trial or should be admitted at the new trial it awards. Only upon proceeding to a harmless error analysis, the Majority suggests, again without necessary and helpful specificity, that those parts of the statements in which Walker names his half-brothers as his accomplices were somehow against Walker's penal interest and therefore admissible. Respectfully, in my view, the Majority reaches an incorrect result that reflects a misapprehension of appellant's arguments and of the basis for the ruling below, and, more importantly, a fundamental misapplication of the declaration against penal interest exception to the hearsay rule.

Here, as in the trial court, appellant's only claim is that the Walker out-of-court statements in their entirety should have been admitted into evidence as substantive proof of appellant's innocence, the Commonwealth's right to cross-examination notwithstanding. Indeed, according to appellant, Walker's entire statements, "line for line and word for word," were against Walker's penal interest and contained important indicia of reliability. Appellant's Brief at 57. Notably, appellant

simply offers that "when Walker acknowledged assisting his own brothers in this conspiracy, that statement constituted a statement against Walker's penal interest which exculpated [a]ppellant." *Id.* at 46. Appellant makes the additional related claim that the trial court's refusal to admit the Walker statements *in toto* deprived him of "a meaningful opportunity to present a complete defense," in violation of his due process rights. *Id.* at 50 (citing *Holmes v. South Carolina*, 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006)). This all-or-nothing theory is what the trial court ruled upon, it is the only theory preserved for appeal, it is the only theory argued on appeal; and the trial court can be faulted, if it can be faulted at all, only for its analysis of the theory appellant chose to argue.[2]

2. Appellant also makes repeated and forceful suggestions that the Commonwealth improperly procured Walker's unavailability and sealed the record of the Walker case, to deprive appellant of exculpatory evidence. *See, e.g.,* Appellant's Brief at 52 (prosecution "extracted from Walker an agreement *not* to testify" at appellant's trial), *id.* at 53 (prosecution "bought off a potential defense witness"). Although the Majority recognizes that appellant raised and preserved no objection on this ground, the Majority indicates that the new allegations raise due process concerns. *See* Majority Op., at 163–63, 171 nn. 55, 60, 52 A.3d at 1173, 1178 nn. 55, 60. But, the allegations are red herrings for which appellant offers no support in the record, and there is none.

Walker's signed, written plea agreement stated, in relevant part: "There is no plea bargain or agreement of any kind, except that **the District Attorney promised** to: [(1)] Recommend a sentence of not more than 30 to 60 years[; (2)] Make no recommendation about my sentence[; (3)] Drop the charges of Murder 1st (2 cts) and to credit all time served, **and will not testify in co-defendant Dwayne Brown's case.** Commonwealth agrees to nolle prose all remaining bills." Guilty Plea Colloquy, 1/24/2006, at 1 (emphasis added). In short, the promise regarding whether Walker would testify was made by the Commonwealth, and not by Walker. Nonetheless, during Walker's oral plea colloquy, the trial court offered: "Now, Mr. Walker, we talked about the fact that for the two cases, the two murders and the agg assault, the conspiracy and the PIC, the Commonwealth is going to nol pros all the other charges. That's just Latin for drop the charges. And you have also promised that you will not testify in Dwayne Brown's case. Is that true?" Walked responded: "Yes, Your Honor." N.T., 1/24/2006, at 62–63. This exchange is contrary to the written plea agreement. Neither Walker nor the Commonwealth addressed the discrepancy. Appellant's suggestion that the Commonwealth procured Walker's promise is based upon the colloquy, rather than the actual plea agreement Walker signed. Notably, the record unequivocally shows that

The Majority rejects appellant's only actual theory and claim for relief: that the Walker confessions in their entirety, or "line for line and word for word," were admissible because they were declarations against Walker's penal interest. *Id.* at 57; *see* Majority Op., at 167, 172–73, 52 A.3d at 1176, 1179–80. Yet, the Majority inexplicably grants a new trial on the ground that the trial court erred in failing to do something it was never asked to do: to parse the statements and admit into evidence **parts** of Walker's confessions.[3]  Because the claim on

Walker requested that the trial court seal the record in his case because he feared for his safety in prison, and Walker's attorney informed the court and appellant's counsel of Walker's refusal to testify at appellant's trial without suggesting any form of prosecutorial coercion. N.T., 1/24/2006, at 86–88 (Walker Guilty Plea); N.T., 1/31/2006, at 11.

3. The Majority constructs a broad theory of issue preservation, which essentially excuses appellant's burden to raise a specific objection in order to preserve an issue for appeal. *See* Pa.R.A.P. 302(a).  A broad objection to the exclusion of Walker's confessions in their entirety is simply not equivalent to or a substitute for a specific objection regarding which individual parts of the confessions should have been admitted. *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114, 115–16 & n. 3 (1974) (appellant who took general exception to jury charge did not preserve specific objection that court should have charged jury regarding presumption of due care, and waived allegation of error on appeal); *see also* Pa.R.E. 103(a).  Appellant here sought admission of the entire statement, and not of individual parts, therefore waiving any claim that the trial court erred in failing to parse Walker's confession for admissible statements. *Accord, e.g., Commonwealth v. Smith*, 604 Pa. 126, 985 A.2d 886, 904 (2009) ("[I]t is beyond cavil that if the ground upon which an objection is based is specifically stated, all other reasons for its exclusion are waived."); *Commonwealth v. Cousar*, 593 Pa. 204, 928 A.2d 1025, 1041 (2007) ("The rule is well settled that a party complaining, on appeal, of the admission of evidence in the court below will be confined to the specific objection there made.").  Indeed, the contrary approach is absurd, essentially forcing the trial judge into a partisan advocate's role, to become co-counsel (if not senior partner) to trial counsel.  Enforcement of salutary and fundamental issue preservation principles here is particularly appropriate because, as the proponent of the evidence, appellant bore the burden of persuasion regarding why the exculpatory parts of the confessions were relevant and admissible as exceptions to hearsay.  Moreover, counsel's choice to forgo parsing Walker's confessions and, instead, to seek admission of them *in toto* was likely tactical, since the governing law—until today— would have counseled that the only relevant, exculpatory parts of Walker's confessions were inadmissible hearsay unless bootstrapped to Walker's self-inculpatory statements which were irrelevant to appellant's defense. *Accord Commonwealth v. Andrews*, 564 Pa. 321, 768 A.2d 309, 316 n. 12 (2001) (tactical reasons explained why, although

which the Majority actually grants relief was waived both below and here and, as the Majority acknowledges, the claim which appellant does forward lacks merit, the award of a new trial is arbitrary.[4]

Furthermore, even if appellant had pursued and preserved a point-by-point parsing of the out-of-court statements, the Majority's reasoning in granting *sua sponte* relief here is erroneous. Evidence Rule 804(b)(3) provides that, if the declarant is unavailable, hearsay statements which are against the declarant's own penal interest may be admissible as substantive proof of the truth of the relevant matter asserted. Pa.R.E. 804(b)(3). A statement against one's own penal interest is one which, at the time of its making, "so far tended to subject the declarant to ... criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." *Id.* Rule 804(b)(3) further requires that a declaration against penal interest is not admissible in a criminal case "unless corroborating circumstances clearly indicate the trustworthiness of the statement." *Id.*[5]

several potential problems existed with conduct of trial, counsel opted to raise single specific objection and waived others).

There is an unfortunate irony in the Majority's gossamer approach. When the trial judge receives the Court's Opinion informing her of the error she made, which requires the time and expense of a new murder trial, she will no doubt be surprised to learn that she has been faulted for a ruling and decision appellant never asked her to make. To make matters worse, she will be faced with a situation where neither appellant, nor the Majority, have yet bothered to parse the statement and identify its allegedly admissible sub-components. Apparently, this will be left to the trial judge. Evidence is not vague or ephemeral; it (like an evidentiary proffer) is supposed to be specific. The judge will be warranted in wondering, if she really was so wrong in her non-ruling, why is it so difficult to specify exactly what "parts" of the hearsay statements she was obliged to *sua sponte* mine and deem admissible.

4. Amicus Defender Association of Philadelphia suggests yet another theory for admission of Walker's exculpatory declarations. According to amicus, the exculpatory portions of the Walker statements were collateral to and necessary to place Walker's self-inculpatory statements into context. This theory likewise was not presented below or by the parties. In any event, the predicate of this theory is missing here because Walker's self-inculpatory declarations were irrelevant to either the Commonwealth's case or appellant's defense, and were, therefore, inadmissible themselves. This argument would pile inadmissible hearsay evidence upon irrelevant (and hence inadmissible) evidence.

The Rule 804(b)(3) exception to hearsay encompasses only declarations inculpatory of the declarant, because such self-inculpatory statements, when supported by corroborating circumstances indicating trustworthiness, are deemed inherently reliable. "[H]earsay declarations which are against the interest of the declarant are admissible on the principle of experience that a statement asserting a fact distinctly against one's interest is unlikely to be deliberately false or heedlessly incorrect, and is thus officially sanctioned, though oath and cross-examination are wanting." *Rudisill v. Cordes*, 333 Pa. 544, 5 A.2d 217, 219 (1939) (quotation marks omitted); *see Chambers v. Mississippi*, 410 U.S. 284, 299, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). Nothing in existing law, or logic, however, extends the assumption regarding the inherent reliability of a statement against one's own penal interest to then encompass declarations against the penal interest of others, including close relatives. Neither does the assumption extend to non-self-inculpatory portions of a broadly inculpatory statement. *Accord* Majority Op., at 174–76, 52 A.3d at 1180–82. As Justice O'Connor explained in addressing the federal counterpart to the Rule 804(b)(3) exception to hearsay:

> Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true. This notion simply does not extend to the broader definition of "statement." The fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts. One of the most

**5.** The Majority is mistaken in asserting that common law decisions which pre-date adoption of Rule 804(b)(3) "do not, in and of themselves, control the resolution of this question since it is the text of the current rule which is now the governing authority." Majority Op., at 173, 52 A.3d at 1179. Indeed, the comment indicates that Rule 804(b)(3) simply restates or "codifies" the common law. Pa.R.E. 804(b)(3) cmt. (rule "is consistent with prior Pennsylvania decisional law"); *see, e.g., Commonwealth v. Nash*, 457 Pa. 296, 324 A.2d 344 (1974) (plurality). More generally, this Court's adoption of the Rules of Evidence did not purport to supplant existing law.

effective ways to lie is to mix falsehood with truth, especially truth that seems particularly persuasive because of its self-inculpatory nature.

*Williamson v. United States,* 512 U.S. 594, 599–600, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994). The application of Justice O'Connor's insight is clear here.

The only parts of Walker's statements that were against his own penal interest here were the assertions in which he implicated himself: *i.e.,* those parts of the statement in which Walker acknowledged that he participated in a conspiracy. In certain cases—where the crime is committed by a single person, for example—such an inculpation may at the same time necessarily exculpate another (or all others). *See, e.g., Commonwealth v. Statum,* 769 A.2d 476 (Pa.Super.2001). Here, Walker's out-of-court account of the conspiracy as a "three-man" conspiracy, although supporting appellant's theory of the crime, was not self-inculpatory to Walker. Moreover, those parts of the statement in which Walker implicated his half-brothers, and thereby inferentially exculpated appellant, were also not self-inculpatory. Stated otherwise, the supposed identity of his accomplices was not inculpatory as to Walker, but only as to the accomplices. *Commonwealth v. Anderson,* 501 Pa. 275, 461 A.2d 208, 215 (1983) ("it is not the statement that must be against interest, but the fact stated."); *accord Williamson, supra.* The theory that three men, rather than two, were responsible for the murders, and assertions against Walker's half-brothers were not remotely against Walker's own penal interest, and thus they have no special, assumed reliability. Indeed, placing blame on others, for instance, is a classic ploy that simply does not inculpate a declarant. *See Commonwealth v. Colon,* 461 Pa. 577, 337 A.2d 554, 558 (1975) (by telling police he acted alone, declarant admitted no additional crime and subjected himself to no additional punishment). Yet, these are the only aspects of Walker's statements which are theoretically relevant to appellant's defense, because they contradict the Commonwealth's theory of the crime, or exclude appellant by implication and name Walker's half-brothers as Walker's accomplices instead.

*See Commonwealth v. McCracken,* 373 Pa.Super. 90, 540 A.2d 537, 538–39 (1988), *aff'd per curiam,* 524 Pa. 332, 572 A.2d 2 (1990) ("under *Anderson* and *Colon,* we first must distinguish between those parts of the out-of-court statement that **inculpate** the declarant and those parts that merely **exculpate** another person. Secondly, we must determine whether the portions of the statement that are inculpatory are **relevant** to the case at bar"). Those with practical experience in the criminal law know that it is both easy and common for a criminal conspirator to inculpate persons with ironclad alibis to protect the declarant's actual cohorts; such diversions, which are not against the declarant's own penal interests, have no special indicia of reliability.

To appreciate the absurdity of pretending otherwise, consider what would happen if Walker's half-brothers were being prosecuted for the murders. Walker's statements inculpating them certainly would be contrary to their penal interest. But, if the Commonwealth attempted to prove its case with this out-of-court hearsay from Walker, Walker's half-brothers would be vociferous in objecting to the introduction of the out-of-court accusations on hearsay grounds. They could properly note that Walker was not inculpating himself when he pointed the finger of guilt at them. If Walker were not available to testify, then his statements implicating his half-brothers would constitute inadmissible hearsay.[6]

6. The Majority adopts the position that the same evidence—Walker's identification of his half-brothers as his accomplices—is self-inculpatory and admissible if offered by appellant to exculpate himself, but would not be admissible if offered by the Commonwealth as evidence against Walker's half-brothers. The notion that the law of hearsay would be so one-sided is very curious and telling.

The primary inquiry under Rule 804(b)(3) is into the self-inculpatory nature of the statement, and does not depend on which party offers the statement into evidence. *See* Pa.R.E. 804(b)(3). Moreover, the inquiry into whether a statement offered by a party is hearsay is independent from whether admission of the same statement under a settled hearsay exception offends the Confrontation Clause, albeit the admission of evidence has right of confrontation implications. Contrary to the Majority's assessment, I do not view the Majority Opinion as altering Confrontation Clause jurisprudence; rather, I am highlighting the right of confrontation implications of applying Rule 804(b)(3) as interpreted by the Majority in the context of a prosecution against Walker's half-

Despite this obvious distinction between what is self-inculpatory and what is exculpatory of others for purposes of declarations against penal interest, the Majority, like the dissent below, apparently would conclude otherwise. *See* Majority Op., at 167–68, 52 A.3d at 1176–77 *and* Super. Ct. Op., at 8 (Klein, J., dissenting) ("[i]t is hard to imagine a trier of fact concluding that a defendant would falsely accuse his own brothers and exonerate a person he· only knows casually."). Actually, it is not at all difficult to imagine why this might occur. If the intention of the declarant is to clear his true accomplices, misdirecting police to persons, even relatives, whom police can easily exclude as suspects does not imperil those persons. In addition, there is an obvious difference between preservation of self and preservation of the interests of others. Even as to self, the theory behind the declaration against penal interest exception is not an absolute: persons may, in fact, falsely confess. *Cf. Commonwealth v. Wright*, 609 Pa. 22, 14 A.3d 798, 816 & n. 16 (2011). The exception simply recognizes the experience of the common law that out-of-court self-accusations, when corroborated, are significantly more reliable than other forms of hearsay.

The common law does not recognize the significant and baseless expansion of the exception postulated by the dissent below in its deficit of imagination, and erroneously accepted by the Majority here. Even if I agreed that the Court should go about expanding the exception on an *ad hoc* basis, neither the Majority nor the dissent below offer support for their assumption that people are just as unlikely to falsely implicate relatives, friends, or others as themselves. Common sense and experience, on the other hand, suggest quite the opposite—which is why our cases have not recognized a "declaration-not-against-penal-interest" exception to hearsay. And, finally, this case is a particularly inappropriate vehicle for the

brothers. *See* Majority Op., at 177–78 n. 67, 52 A.3d at 1182 n. 67. In the unlikely event that a Court someday were to determine that the time-worn declaration against penal interest exception to the hearsay rule violates the Confrontation Clause—to my knowledge, no court has so held, and certainly no court whose decisions bind this Court—the

Majority's radical revolution of the declaration against penal interest exception, since these considerations are not accounted for in its reasoning, and since, as noted, the challenge actually forwarded here is a generic one.

If Walker's out-of-court accusations against his half-brothers had been admitted at trial, the Commonwealth would have had no opportunity to cross-examine Walker and test his credibility or motives for exculpating appellant and, concomitantly, accusing his half-brothers. Like most out-of-court statements of unavailable declarants, exculpatory declarations are traditionally inadmissible to prove the truth of the matter asserted "because they lack the conventional indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury." *Chambers*, 410 U.S. at 298, 93 S.Ct. 1038; *cf. Lilly v. Virginia*, 527 U.S. 116, 133, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality) ("non-self-inculpatory" portions of a declaration are presumptively unreliable). Yet, the Majority would admit those unreliable declarations into evidence nonetheless, to benefit appellant and compromise the truth-finding process.

Further, while the Majority decision rings-in an undeserved reward for this appellant, it only promises a nearer Judgment Day for numerous other criminal defendants. In this case, it is the defense that seeks to make use of a non-inculpatory portion of a declarant's out-of-court statement. But, the more common scenario—after this decision—will be one where the Commonwealth seeks to introduce a co-conspirator's out-of-court statements which implicate himself and his cohorts—*i.e.*, the scenario that would arise here if the Commonwealth were to prosecute Walker's half-brothers. Under the Majority's holding, the non-exculpatory implication of one's cohorts in crime can now be admitted by bootstrapping it to the self-inculpatory aspects of the declarant's out-of-court confession. *See Lilly*, 527 U.S. at 127, 119 S.Ct. 1887 ("In criminal trials, statements against penal interest are offered into evidence in

reasoning and effect, no doubt, would undermine the exception for all parties.

three principal situations: (1) as voluntary admissions against the declarant; (2) as exculpatory evidence offered by a defendant who claims that the declarant committed, or was involved in, the offense; and (3) **as evidence offered by the prosecution to establish the guilt of an alleged accomplice of the declarant.**") (emphasis added). According to the Majority's application of Rule 804(b)(3), those portions of Walker's statements implicating his half-brothers in the murders would be deemed declarations against Walker's penal interest, and would be admitted at trial for the truth of the matter asserted against the half-brothers, even though there is no reason to deem those accusations reliable, and notwithstanding that Walker did not testify or make himself available for cross-examination. The half-brothers would have no opportunity to confront or cross-examine Walker, the Commonwealth's accuser. Under the Majority's present decision, the Commonwealth would be within the permissible boundaries of the hearsay rule to offer the presumptively unreliable Walker statements as substantive evidence that his half-brothers committed the murders. *See Lee v. Illinois*, 476 U.S. 530, 541, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) (accomplices' confessions that incriminate others are presumptively unreliable).

Consistent with this reasoning, Walker's declarations inculpating his half-brothers, and concomitantly exculpating appellant, were hearsay and inadmissible as substantive evidence. The Rule 804(b)(3) exception for statements against penal interest did not apply to Walker's exculpatory declarations, even if appellant had requested admission of only those parts of Walker's statements.

Furthermore, I would reject appellant's constitutional claim that the exclusion of Walker's hearsay declarations denied appellant a meaningful opportunity to present a complete defense and, therefore, violated his due process rights. Appellant's Brief at 39–43. State rulemakers have "broad latitude under the Constitution to establish rules excluding evidence from criminal trials," limited only if the evidence rules are "arbitrary or disproportionate to the purposes they are designed to serve." *Holmes*, 547 U.S. at 324–25, 126 S.Ct.

1727 (quotation marks omitted). The High Court stated in *Chambers* that "[t]he hearsay rule, which has long been recognized and respected by virtually every State, is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact." 410 U.S. at 298, 93 S.Ct. 1038. Due process does not require admission of evidence in violation of our Rules of Evidence— and especially of a rule of evidence which is universally "recognized and respected," the hearsay rule—even where the patently unreliable evidence offered is allegedly exculpatory. The unavailable Walker's out-of-court statements here, which appellant sought to introduce only in their unparsed entirety, were inadmissible hearsay and the trial court did not deny appellant any opportunity to present a defense by excluding such patently unreliable evidence. Appellant is no more entitled to employ this hearsay offensively here than the Commonwealth would be to use the statements offensively in a prosecution of Walker's half-brothers. Appellant's constitutional argument has no merit.[7]

For these reasons, I respectfully dissent from the award of a new trial.[8]

7. We granted allocatur to clarify the application of Rule 804(b)(3) and its interplay with the Due Process Clause of the Fourteenth Amendment. Pa.R.E. 804(b)(3) (hearsay exception for statement against interest, where declarant is unavailable). The Majority ultimately does not address the constitutional issue.

8. Because I conclude that Walker's declarations that would tend to exculpate appellant were not against his penal interest, I do not reach the issue addressed by Mr. Justice Eakin in his Concurring and Dissenting Opinion regarding the corroboration identified by the Majority as supposed indicia of the trustworthiness of Walker's statements. But, I would note that the question of what type of corroboration is sufficient is not yet settled. One commentator has described the definition of "corroboration" in the context of the federal Rule 804(b)(3) as "hopelessly confused." McCormick on Evidence, Practitioner Treatise Series, § 319, at 328 (5th Ed.1999). McCormick suggests that "[c]orroboration of the trustworthiness of the out-of-court declaration should generally focus on the circumstances of making of the statement and the motivation of the declarant.... Significantly, the rule does not require that the statements themselves be independently proved to be accurate; rather it requires only that corroborating circumstances indicate trustworthiness." *Id.*

Justice EAKIN, concurring and dissenting.

I join the majority's holding that witnesses' recanted out-of-court statements to police were sufficient to sustain Appellant's convictions. However, I find no error in denying the admission of the co-defendant's "confession;" that hearsay statement was inadmissible because the trial court specifically found it to be unreliable and untrustworthy. *See* Trial Court Opinion, 5/11/07, at 5–6. To be admissible under our Rules of Evidence, there had to be a finding of the exact opposite—hence, there was no abuse of discretion in denying its admission.

Appellant argues his co-defendant Walker's confession made to police should have been admitted under the statement against interest exception to hearsay exclusion under Pa.R.E. 804(b)(3). The relevant portion of this rule provides:

(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. *In a criminal case, a statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.*

Pa.R.E. 804(b)(3) (emphasis added).

We must remember admissibility is determined using an abuse of discretion standard. It is well-settled that:

The admissibility of evidence is within the sound discretion of the trial court, wherein lies the duty to balance the evidentiary value of each piece of evidence against the dangers of unfair prejudice, inflaming the passions of the jury, or confusing the jury. We will not reverse a trial court's decision concerning admissibility of evidence absent an abuse of the trial court's discretion.

*Commonwealth v. Flor*, 606 Pa. 384, 998 A.2d 606, 623 (2010) (citations omitted). "[A]n abuse of discretion is not merely an error of judgment. Rather, discretion is abused when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record." *Id.*, at 620 (citation omitted).

Appellant makes no argument the trial court abused its discretion in this finding, and I find no abuse of discretion here. Clearly, the statement at issue tended to expose the declarant to criminal liability—though it tried to minimize the declarant's involvement, it was still a confession to a crime— thus, Pa.R.E. 804(b)(3) would facially allow admission, but in a criminal case, the rule requires more—specifically, a finding of trustworthiness indicated by corroborating circumstances. The trial court did not find such circumstances in this case, and in fact found just the opposite.

The trial court pointed out that Walker's confession was completely contradictory to the statements he made under oath during his guilty plea colloquy. The majority does not address the trial court's finding or the inconsistency between the confession and the colloquy. The trial court determined this contradiction negated any indicia of reliability or trustworthiness in the prior statement. While my colleagues stress the fact declarant had been given *Miranda* warnings, this hardly demands a trial judge give credit to that which follows. At best an abstract and neutral factor, *Miranda* warnings do not make that which follows trustworthy, and I suggest we not suggest such a thing. People lie to police all the time, warnings or no warnings, and I see no abuse of discretion in crediting statements to a court under oath rather than semi-exculpatory statements to police. An appellate court is in no position to second-guess this finding.

I further distance myself from any notion that the trustworthiness of a hearsay statement is properly measured by what is *actually* against penal interests—trustworthiness depends on what is *reasonably believed* to be against interest. A statement that minimizes one's participation may be perceived

as limiting incrimination, rather than being incriminating—the factors relevant to trustworthiness must be measured in context. The dissent of Judge Klein, cited in some detail by my colleagues, seem to ignore this point, speaking largely of actual legal harm rather than whether the declarant believes he is helping or hurting himself. Admissibility turns on the belief of the declarant, not the legal reality established by parsing the rules of hearsay evidence—if they are indecipherable to law students and practitioners, they have no place in evaluating the motivations of others.

I see no abuse of discretion in the trial court's determination that Walker's statements were inadmissible, and I would affirm the Superior Court. Accordingly, I respectfully dissent from granting Appellant a new trial.